THE NATIONAL EXCHANGE BANK OF LANSINGBURGH, Respondent, *v.* CHARLES A. SILLIMAN et al., Appellants.

Defendants indorsed a promissory note for the accommodation of E. B., the maker, and S. E. B., the first indorser, which note was discounted by plaintiff. The B.s had obtained various other loans from plaintiff, and previous to opening an account had deposited, as collateral, certain securities belonging to the wife of E. B. Subsequent to the discount of said note plaintiff purchased a past due note of the B.s. The notes not being paid the collaterals were sold and converted into money. In an action upon defendants' indorsement the court below decided that the proceeds of the collaterals should be applied, *pro rata,* upon the notes. *Held,* error; that the presumption was, in the absence of proof, that the collaterals were deposited to secure loans and discounts made to the B.s, not all claims which plaintiff might acquire; and that defendants were entitled to have a priority in the application of the avails.

Also, *held* (DWIGHT, C.), that defendants, as sureties, were entitled to subrogation to the claim of plaintiff and acquired an equitable lien upon the collaterals, which right accrued as soon as their liability attached and could not be affected by the creditors; and that, in the absence of proof of a different arrangement, the presumption was they were entitled to a priority over sureties upon other and later claims, or over the creditor upon subsequent loans.

*Farebrother* v. *Wodehouse* (23 Beav., 18) distinguished.

(Argued May 6, 1875; decided June term, 1875.)

APPEAL from judgment of the General Term of the Supreme Court in the third judicial department, affirming a judgment in favor of plaintiff entered upon a verdict:

This action was brought against the defendants as second indorsers of a note made by E. Babcock, on or about May 19, 1864, payable to the order of S. E. Babcock, and indorsed by him. The indorsement of the defendants was in their firm name, of Silliman, Matthews & Co. The answer admits the making and indorsement of the note, but denies the other allegations of the complaint. It also alleges, that, at the time of the commencement of the action, E. Babcock and S. E. Babcock, the maker and indorser, transacted business and kept an account with the plaintiff, and that during a

greater part of the time intervening between May 19, 1864, and the commencement of this action, and at the maturity of the note, the plaintiff held securities, pledged to it by E. Babcock and S. E. Babcock, as collateral securities for all moneys advanced to them upon business paper, of which the note in litigation was a part. It was further set forth that, after the maturity of the note, the plaintiff had sufficient funds in its possession belonging to the Babcocks to pay and satisfy the note and all other indebtedness due from them, which it was its legal duty to apply to such indebtedness, and to discharge the defendants from their liability, and the defendants were accommodation indorsers, receiving no consideration or benefit from their indorsements.

It appeared at the trial, that previous to the opening of an account with the plaintiff's bank and obtaining loans therefrom, the Babcocks deposited collaterals belonging to Armena Babcock, wife of E. Babcock, and mother of S. E. Babcock, as security for the transactions between the parties. There was a dispute as to whether the collaterals were given to secure loans or discounts, or whether no discretion whatever was given on this subject. The evidence bearing on this point is stated in the opinion.

After the note in litigation was discounted and before its maturity, viz., March 16, 1864, the plaintiff purchased of the firm of I. E. & T. C. Spicer & Co. a note made by S. E. Babcock and indorsed by E. Babcock, which was past due; and at the same time executed to the Spicers an agreement in writing, whereby, after reciting the purchase of the note of $300, dated December 23, 1863, it promised to pay the Spicers the sum of $250 and interest thereon, provided the said bank collects the whole amount of the said note, and if only a portion of the amount due should be collected, then it was to pay Spicer & Co. such portion of that amount as $250 bears to $300, the costs and expenses of collection being deducted before distribution.

The court held that a balance of moneys realized from a sale of the collaterals, amounting to $305.29, besides interest,

should be applied *pro rata* upon the Spicer note and that in litigation, and, under exception, directed a verdict in favor of the plaintiffs for the sum of $256.56, to which defendants' counsel duly excepted.

Other exceptions taken in the case are sufficiently referred to in the opinion.

*R. A. Parmenter* for the appellants. The intention of the parties in relation to the appropriation of payments might be inferred from circumstances, it not having been expressly declared. (*Seymour* v. *Van Slyck*, 8 Wend., 420; *Baker* v. *Stackpole*, 9 Cow., 420; 2 Story on Con., § 878; 2 Pars. on Con., 141.) The declarations of plaintiff's cashier with regard to the depending business were part of the *res gestæ*, and were admissible as evidence. (1 Greenl. Ev., § 113; *Van Rensselaer* v. *Morris*, 1 Paige, 13; *Thalhimer* v. *Brinckerhoff*, 6 Cow., 90; *Magill* v. *Kauffman*, 4 S. & R., 317, 321; *Brehen* v. *G. W. R. Co.*, 34 Barb., 256; *Kelly* v. *Campbell*, 1 Keyes, 29.) The court erred in refusing to submit the case to the jury. (*Stone* v. *Flower*, 47 N. Y., 566.)

*E. L. Fursman* for the respondent. The declarations of plaintiff's cashier were properly excluded. (*Thalhimer* v. *Brinckerhoff*, 4 Wend., 394; *Budlong* v. *Van Nostrand*, 24 Barb., 24; *Baker* v. *Stackpole*, 9 Cow., 436.) Plaintiff's right to apply the funds to any discounted paper of the Babcocks cannot be questioned. (*Van Rensselaer* v. *Roberts*, 5 Den., 470; *Baker* v. *Stackpole*, 9 Cow., 420, 436.) The agreement between plaintiff and the Babcocks was sufficient to transfer the title of the Silliman note and create the relation of debtor and creditor between them. (*Cummings* v. *Morris*, 25 N. Y., 625.) No actual application having been made by the debtor or creditor the law would apply the payment to the oldest debt. (*Webster* v. *Dickinson*, 11 Wend., 62; *Allen* v. *Culver*, 3 Den., 284; *Hunter* v. *Osterhout*, 11 Barb., 33.)

DWIGHT, C. The leading question in this cause concerns the right of the defendant to insist that the proceeds of cer-

tain collateral securities held by the plaintiff shall be applied in their favor, in preference to a note which the plaintiff had purchased after maturity. The argument of the defendants is, that the collaterals were deposited as a security for loans and discounts made to the Babcocks by the bank, and cannot be applied (certainly as between themselves and the plaintiff) to the payment of a note purchased after maturity and dishonor. They urge that the collateral securities were given solely to secure loans and discounts made to the Babcocks, and therefore cannot be used to pay notes purchased after they were due.

The evidence bearing upon the use to be made of the collaterals is quite meager. The cashier of the plaintiff testified that he received the collaterals before any loans were made, and that they came from Armena Babcock, wife of the maker, and mother of the first indorser of the note. They consisted of several mortgages upon canal boats, pumps and fixtures. The purpose was stated in the mortgages, but it was not disclosed in the evidence. The question thus arises whether, in the absence of evidence bearing upon the intent of the parties, the presumption is, that the securities were given to cover all claims which the bank might in any manner acquire, or only such as were in some way beneficial to the Babcocks? It seems to me that the latter view is the correct one. The collaterals were deposited by the wife and mother of the persons primarily liable. She herself held the position of surety towards them. It is reasonable to suppose that by placing the property with the bank she intended to render a service to her relatives. They might receive substantial aid by loans and discounts. Of what possible benefit could it be to the Babcocks to have the bank buy their paper after maturity? What reason can be suggested why Mrs. Babcock should sacrifice her property to protect the bank? The Spicers, holders of the dishonored note, had no security, and might, of course, have instantly pressed for the payment. So could the bank after its purchase. The plaintiff asks us to presume that the object of Mrs. Babcock was to devote her property

to the payment of a debt in its hands, under a transaction from which her relatives could, apparently, derive no benefit. This presumption is so unnatural and improbable, that I do not see that it can be entertained.

There is, however, another objection to the plaintiff's right to apply the proceeds of the collaterals to the Spicer claim. The defendants, as indorsers, according to general principles of law, being sureties, were at once entitled to be subrogated to the claim of the plaintiff. Their right to subrogation accrued as soon as their liability attached, as the collaterals became a trust fund for the payment of the note on which they were indorsers. (*Butler* v. *Birkie*, 13 Ohio [N. S,], 514; *Ohio Life Ins. Co.* v. *Ledyard*, 8 Ala. [N. S.], 866; *Roberts* v. *Colvin*, 3 Grat., 358; *Agnew* v. *Bell*, 4 Watts, 31; *Hayes* v. *Ward*, 4 J. Ch., 123.) The rule must be applied in favor of indorsers as well as other sureties. (*Bennett* v. *Cook*, 45 N. Y., 268.) In that case, a holder of a promissory note, having a collateral security in his possession, was held legally bound to apply it in favor of the indorser against whom he enforced his claim. (See, also, *Vail* v. *Foster*, 4 N. Y., 312.)

The only doubt that can arise in the case at bar is, whether the defendants can insist on a priority of application of the proceeds of the collaterals, or whether they are only entitled to share in them, *pari passu*, with the plaintiff as holder of the Spicer note. I think that the presumption is, that the equity of a surety attaches to the trust fund as soon as the trust relation is created, and that the burden of proof is on any one who asserts the contrary to establish it. Undoubtedly, an arrangement might be made whereby the right of subrogation might be qualified or modified by agreement, so that subsequent sureties, on wholly different and later claims, might participate in the benefit of collateral securities. This would not be the ordinary rule, and some evidence would be required to establish its existence in a particular case. The same rule must be applied to a creditor making subsequent advances to the debtor who deposited the collaterals; while as between him and the debtor, they might be applied to all the claims ratably, yet as to the

surety, they could not be, unless he knew, or had reason to know, that such was the fair intent of the transaction. The ordinary interpretation of the dealings of the parties would be, that the surety, when he undertook his liability, acquired, in equity, a lien upon the fund, which the creditor could not displace. No evidence was offered by the bank that the defendants knew or assented to a transaction so entirely different from a loan as the purchase of the over-due Spicer note, and, accordingly, on general principles of law, they must be deemed to have a superior claim in equity to the Babcock collaterals. It is not necessary to contend that these rules would be applicable if the collaterals were deposited as security for one transaction consisting of several parts or branches. In that case, it may be that there are no superior equities, and that the collaterals must be applied to the entire indebtedness. This was so held in *Farebrother* v. *Wodehouse* (23 Beavan, 18). This case was placed distinctly on the ground that, at the very time that the surety entered into his obligation, there was a loan of two sums by the same creditor to the same debtor, of which the surety was made aware. The case at bar would resemble it if it should be supposed that a number of notes were discounted at one time, and on one of them there was an indorser, and on others none, and the indorser knew all the facts; even then the doctrine of tacking would need to be invoked to shut out the surety. Whether that could be applied in our law I need not consider. What now is claimed is, that the rule of priority must prevail where the transactions are distinct and unconnected, and that where they are apparently separate, the burden of proof is on the creditor to show their connection, and thus to overcome the rule of priority.

The principles thus stated are sustained by the authorities.

In *Bowker* v. *Bull* (1 Sim. [N. S.], 29), it appeared that A had mortgaged his estates to B to secure the sum of £6,000. His daughters, as sureties, also mortgaged their property to secure the same loan. There was a statement in the deeds, without prejudice to any of the rights of the mortgagee, that

as between A and the daughters, A and his estates were primarily liable for the debt. Six years afterwards A mortgaged the property embraced in the first mortgage to B., to secure an additional loan of £700. It was held that A was not entitled, as against A's daughters, to tack the second mortgage to the first, but that the daughters were entitled to redeem the first mortgage on payment of £6,000. What the daughters insisted upon was, that if they paid off the first mortgage debt they should be subrogated to B's rights without reference to the second loan, and the court held that they were right. The court said : " On the part of the children it was contended that Bowker (the creditor) must be postponed to them as far as relates to the latter charge, and I think that they are right. The children are, according to what appears on the face of the deed, mere sureties for their father. Bowker, when he took his further charge, in 1849, had full notice of this, and he could, therefore, only take subject to such rights as the daughters had acquired by reason of their having concurred in the former deed. Now, it is quite clear that a surety paying off the debt of his principal is entitled to a transfer of all the securities held by the creditor, in order that he may make them available against the debtor, as the original creditor might have done. On these grounds the daughters were certainly entitled, on paying off the £6,000 mortgage, to have all the securities comprised in the deed of the 3d of March, 1843, made over to them, in order to enable them to reimburse themselves out of their father's separate property, comprised in that deed, whatever portion of the £6,000 they might have been obliged to pay; and this is a demand, certainly, prior in point of date to the last mortgage. It was urged at the bar on behalf of Bowker, that this right of a surety was only a potential equity, which though it may be asserted by the party himself, yet cannot bind third persons. But I cannot agree to this. The equity gives to the surety a right to call for the transfer of the securities, and so *binds* those securities, into whatever hands they may come, with notice of the charge." (P. 34.)

It will be observed that the leading points in this argument are, that the two transactions are distinct and that the creditor in making his advances upon the second mortgage was aware of the rights of the surety. This fact also exists in the case at bar, as the bank knew that the defendants were indorsers and that the property deposited by Mrs. Babcock was held as collateral. This conclusion might be modified in England under the special rules applicable to the tacking of mortgages. It may plausibly be argued there that as it is a recognized rule of law that a mortgagee may thus tack a second mortgage to the first, a surety on the first mortgage tacitly consented to such an act of tacking, and therefore could not insist that the first mortgage should be applied, under the doctrines of subrogation, to his relief. Such was, apparently, the view in *Williams* v. *Owen* (13 Sim., 597). Independent of that doctrine, the rule is now well settled in favor of the surety's priority. (See *Pearl* v. *Deacon*, 24 Beavan, 186; S. C., on appeal, 1 De Gex & Jones, 461.) In this case certain landlords advanced money to their tenant on a joint note of himself and a surety; they afterwards took collateral security for this sum by an assignment of the furniture of the tenant by way of mortgage. They then proceeded to distrain upon the furniture for rent due; it was held that this act discharged the surety. This was no more than holding, that if the security had been appropriated to a particular debt it could not be diverted by the creditor to pay any other claim which he might have. This case, steering entirely clear of any doctrine of tacking, as applicable to mortgages — an anomaly in the law, and recently abolished (see 37 and 38 Vict., chap. 78, § 7, A. D. 1874), shows the rule upon its merits as enforced in favor of sureties. Reference should also be made to *Drew* v. *Lockett* (32 Beav., 499; S. C., 9 Jur. [N. S.], 786), and *Smith* v. *Bloxam* (2 H. & M., 457.) The first of these cases involved the question of the priority of the surety to a creditor who had made subsequent advances with knowledge of the relations of the parties. The court laid down the general rule that the surety is entitled to

be subrogated at once to any security held by the creditor, and only admitted an exception when the special facts of the case showed that the surety knew that if the mortgagee, the payment of whose debt he guaranteed, advanced any further money to the mortgagor on the security of the same property he would be entitled to tack the further advances to·his original claim. I have ·found no case defeating or qualifying the surety's right of subrogation unless it proceeded on the theory of tacking, and·the knowledge by the surety either expressly or by implication that the right to tack existed. In *Smith* v. *Bloxam*, the right of the surety to subrogation was fully recognized, though the court declined to extend it so far as to include as against a subsequent mortgagee the costs of a personal action against the surety unsuccessfully defended by him.

The result of the whole discussion is, that as far as appears in the case at bar, the plaintiff was bound to hold the collateral security supplied by the Babcocks in trust for the defendants, who had a legal priority over the plaintiff's claim under the Spicer note. It was incumbent on the plaintiff, to avoid this result, to show that it was within the contemplation of the parties that the security should be applied ratably to the payment of that note. Assume that the bank had not bought the Spicer note, it is then entirely clear that the defendants would have been entitled to enough of the Babcock collaterals to have paid off the entire claim against themselves. · Then suppose, while matters are in this condition, the Spicer note is purchased ; must not the bank show affirmatively its right thus to cut down and reduce the claim of the defendants to subrogation which had already·apparently attached to the entire amount of their debt? The cashier of the bank testified that the Babcocks gave him no direction in what way to apply the money received from the collaterals, and that there was no direction given as to their application in any form.

Under this state of facts the presumption must be, in the absence of proof, that the ordinary right of subrogation attached to the defendants' note as it was discounted. ·The plaintiff

having made no such proof, the court below erred in the result to which it arrived, and its judgment should be reversed.

All concur on the ground first discussed, without expressing any opinion upon the second ground.

Judgment reversed.