MOLINE MALLEABLE IRON CO. v. YORK IRON CO.

(Circuit Court of Appeals, Seventh Circuit. November 8, 1897.)

No. 416.

1. PRINCIPAL AND AGENT—SALES BY AGENT—PURCHASER'S LIABILITY TO PRINCIPAL.

Where a purchaser of goods from agents knows whom they are agents for, and that the goods in question are of the principal's manufacture, and where the invoice calls attention to the agency and to the principal's ownership, the purchaser is liable to the principal for the agreed price.

2. SAME—ELECTION TO HOLD AGENT.

Even if it were true that the reception by one party, of a contract executed on the other part in the name of an agent, with knowledge that the agent acted for a principal, constitutes a conclusive election to look alone to the agent, yet quære whether such election involves a reciprocal abandonment by the principal of his rights against the other party to the contract.

3. SAME—PRESUMPTIONS.

Even if that proposition were established, yet there would, at least, be a presumption that the principal was the contracting party, unless it

clearly appeared that the agent contracted on his own account, and that, with a knowledge of the facts, the opposite party elected to look to the agent.

4. CONTRACTS—PERFORMANCE—ACTIONS.

When a party has fully performed his part of a written contract, and nothing remains to be done but for the other party to pay the money due under the contract, a recovery may be had under the common counts.

5. REVIEW ON ERROR—HARMLESS ERROR.

Though improper evidence be admitted, under an erroneous theory of the measure of damages, the error is not ground for reversal if the actual recovery is in accordance with the correct rule.

6. SALE BY AGENT—SUIT BY PRINCIPAL—AGENT'S LIEN.

The fact that an agent who sells goods had a qualified title in the goods and their proceeds as pledgee, as against his principal, does not impair the principal's right of action against the purchaser to recover the agreed price, particularly where the purpose of the pledge is accomplished before the action is brought.

7. SAME—SET-OFF.

A purchaser of goods from the agent of a known principal cannot set off against his debt for the purchase a sum owing to him from the agent.

Showalter, Circuit Judge, dissents.

In Error to the Circuit Court of the United States for the Northern District of Illinois.

This is an action in assumpsit upon the common counts, brought by the York Iron Company to recover for 300 tons No. 2 soft Minneapolis pig iron, alleged to have been sold to the plaintiff in error through the agency of Forsyth, Hyde & Co., at the price of $15 per ton. For nearly seven years prior to the 16th of May, 1893, Forsyth, Hyde & Co. had been the agents at Chicago of the defendant in error, under a written agreement by which that firm undertook to act as the agents of the York Iron Company in the sale of the product of its furnace at Black River Falls, Wis. They were to have the exclusive sale of all the pig iron produced at the furnace during the period of the agreement. All sales of such iron should be made by them as agents for and in the name of the York Iron Company, and subject to its approval, and for a stated commission; and they were to collect for sales made by them, and to remit to the company, but they did not guaranty the collections. On May 16, 1893, Forsyth, Hyde & Co. sold to the plaintiff in error 300 tons No. 2 soft Minneapolis pig iron, manufactured by the defendant in error. This iron was at the time at the furnace at Black River Falls, Wis., not segregated from a larger amount of similar iron stored at that place. The iron was shipped to the Moline Malleable Iron Company between June 6 and June 8, 1893, and was received by them on the 16th, 17th, and 18th days of June, 1893. Forsyth, Hyde & Co. rendered to the plaintiff in error a sale memorandum, describing the character and price of the commodity sold, and stating the terms to be "spot cash," with privilege of four months' time, at 6 per cent. interest, upon a blank headed, "Forsyth, Hyde & Company, Pig Iron Commission," and, prior to the receipt of the iron by the Moline Malleable Iron Company, rendered to it invoices of the iron shipped upon billheads headed, "Commission Pig Iron. Moline Malleable Iron Company, St. Charles, Ill., bought of Forsyth, Hyde & Company, Agents for York Iron Company. Terms, Cash." The plaintiff in error had for several years dealt with Forsyth, Hyde & Co., and knew that they were agents for the York Iron Company, and knew that the stated brand of iron was the product of the furnace of the York Iron Company, which was a well-known brand of iron of that company's manufacture, and the iron delivered was so marked. A few days before the sale, Hyde, of Forsyth, Hyde & Co., went to Minneapolis, and arranged with the York Iron Company that he should endeavor to make immediate sales of iron, and, if necessary, to lower the price one or two dollars a ton. He returned to Chicago, and sold 200 tons to the Rockford Malleable Iron Works, 300 tons to the Moline Malleable Iron Company, and 1,500 tons to the Pullman Company, and at once, by wire and by letter,

notified the York Iron Company of the sales. He then returned to Minneapolis to further consult with the York Iron Company. Before this time, Forsyth, Hyde & Co. had accepted drafts for the accommodation of the York Iron Company to the amount of $30,000, and it was desired that they should accept further drafts to the amount of $6,000 to enable the York Iron Company to meet pressing liabilities. It was arranged that such acceptances should be made, and that 3,000 tons of iron should be placed by the York Iron Company in possession of a storage company, and that such company should issue certificates for the iron. This was done, the storage company issuing certificates for 2,000 tons to Forsyth, Hyde & Co., and for 1,000 tons to the York Iron Company. It was arranged that Forsyth, Hyde & Co. should use the certificates issued to them to complete the sales made to the three companies named, and that the proceeds could be used to take up the obligations of the York Iron Company upon which Forsyth, Hyde & Co. were liable. The iron was estimated to be worth $13.50 per ton at the furnace where it was stored. At this time one piece of accommodation paper to the amount of $2,500 had matured, and had been taken up by Forsyth, Hyde & Co.; and they subsequently, in May and June of that year, took up three other pieces of paper of $2,500 each, making a total of $10,000, which they paid. They received the avails of the sale to the Pullman Company, amounting to over $20,000, and a portion of the Rockford claim. Forsyth, Hyde & Co. failed and assigned on the 5th day of July, 1893, at that time owing to the York Iron Company $20,000 over and above the $10,000 of accommodation notes which they had paid. All the other accommodation paper upon which Forsyth, Hyde & Co. were liable was taken up and paid by the York Iron Company. It was understood between the parties at the time of the making of the arrangement that if the Moline Company should fail, and the account should not be collected, the loss would fall upon the York Iron Company.

Some time in the year 1892 the Moline Malleable Iron Company had executed its notes to the amount of $5,000, for the accommodation of Forsyth, Hyde & Co. For these notes, renewal notes had been given, maturing in July, 1893, at which time they were paid by the plaintiff in error. With respect to that transaction, Mr. Ullman, the president of that company, states that Forsyth asked him for some notes which he could discount. "I told him that we owed him nothing, and he said that he wanted the money, and it would be a great accommodation if I could give him that amount in notes. I finally told him that I would do so, but I would charge it on account to Forsyth, Hyde & Co." The plaintiff in error pleaded the general issue with a statement of special matter intended to be relied upon under that plea, which was to the effect that, for many years prior to the purchase of the iron sued for in this suit, the defendant had purchased iron of the firm of Forsyth, Hyde & Co. on many occasions and in large amounts; that it purchased such iron of that firm as the owners thereof, and made payments therefor with the notes of the defendant to the order of Forsyth, Hyde & Co., without any knowledge that the plaintiff (defendant in error here) was the owner of any of the iron so procured; that it purchased the iron in controversy of Forsyth, Hyde & Co., and at that time the Moline Malleable Iron Company had a credit with Forsyth, Hyde & Co. for the proceeds of the accommodation notes given to that firm; that it purchased the iron in question without knowledge that the plaintiff had any interest therein, and, if it had, the iron had been paid for to them by drafts accepted by Forsyth, Hyde & Co., and was at the time of the purchase the property of Forsyth, Hyde & Co.; and that in accordance with its custom in purchasing iron of Forsyth, Hyde & Co., and paying for the same with notes, the Moline Malleable Iron Company had the right to purchase the iron from Forsyth, Hyde & Co., and pay for the same with its said notes then held by Forsyth, Hyde & Co. The only witness testifying verbally to the contract of sale was Mr. Ullman, the president of the plaintiff in error. He states that he purchased the iron in question of Mr. Hyde; that he did not remember the particular conversation had with him further than the purchase of the iron, and, after stating that at the time of the purchase a reference was made to the accommodation notes given to Forsyth, Hyde & Co., he first stated that all that was said with respect to the notes was that Hyde had those notes,

"and he wanted me to take this iron in satisfaction of the notes." Being asked whether he was certain about that, he responded: "I testified that there was nothing said in the talk about the notes. We having the notes then, he said: 'I want to sell you that iron. I want to sell you three hundred tons of iron;' and we took the iron, and I understood— Q. Never mind what you understood; just what you said. A. No; nothing further was said about it. Q. So, there was no reference made to these notes at the time you purchased this iron? A. There was the talk that he owed us for those notes earlier in the conversation, but there was no conversation further than that in the purchase of the iron. We talked about his owing us for these notes. Then he went on, and talked about buying so much iron from him. I said there was no connection made with the purchase of the iron at that time. There was the talk that he owed us for those notes earlier in the conversation, but there was no conversation further than that in the purchase of the iron. We talked about his owing us for those notes, and afterwards about buying so much iron from him." At the trial, counsel for defendant below requested the court to instruct the jury that if they believed from the evidence that exclusive credit was given by defendant to Forsyth, Hyde & Co., and it contracted with them exclusively in respect of the iron to recover the price for which suit was brought, then plaintiff could neither sue nor be sued upon such a contract. This request was refused, and a proper exception reserved. The court was further requested to charge the jury that, from the facts given in evidence, plaintiff was not entitled to recover. This request was overruled, and proper exception reserved. The court charged the jury that the only question was whether it had been proven that the plaintiff, through its agent, had sold and delivered to the defendant the pig iron sued for, and, if so, they should return a verdict for the plaintiff for the value at the time and place delivered. There was a verdict for the plaintiff below.

S. S. Gregory, for plaintiff in error.

Charles M. Sherman, for defendant in error.

Before WOODS, JENKINS, and SHOWALTER, Circuit Judges.

JENKINS, Circuit Judge. The right of a principal to sue and his liability to be sued upon a contract made by an agent in the name of and for the benefit and advantage of the principal are unquestioned; nor is it doubted that an undisclosed principal may sue or be sued upon a contract made by his agent in the name of the latter (Story, Ag. § 160a; Mechem, Ag. § 769), except possibly (1) when the agent has contracted personally by deed; (2) when, in a contract of sale, the agent has a lien upon the subject-matter of the contract, or its proceeds, exceeding or equal to the value, in which case the right of the agent is paramount to that of the principal; (3) when an exclusive credit is given to and by the agent. Ewell's Evans, Ag. 525 (404). There has been some contention whether, with respect to a written contract executed in the name of an agent, the party who received the contract knowing that the agent acted for a principal could hold the principal; the supreme court of New Hampshire holding, contrary to Story, that in such case the reception of such a contract constituted a conclusive election to look alone to the agent. Chandler v. Coe, 54 N. H. 561–573. It may be doubtful whether the doctrine of this case can be upheld. Calder v. Dobell, L. R. 6 C. P. 486–498; Insurance Co. v. Allen, 116 Mass. 398; Byington v. Simpson, 134 Mass. 169; Nicoll v. Burke, 78 N. Y. 580. But quære whether such election by a third party involves an abandonment by the principal of his rights against the third party under a

contract made by his authority. Whart. Ag. § 403. We need not concern ourselves, however, at this time, with that controversy; for as well the court of New Hampshire as the other courts recognizes the doctrine as to express verbal contracts that, "if the principal was known, it is to be presumed that he was the contracting party, unless it clearly appears that the agent contracted on his own account, and that, with a knowledge of the facts, the opposite party elected to look to the agent." Chandler v. Coe, 54 N. H. 561, 575.

The difficulty with the instruction the refusal to give which is first assigned for error is that there is no evidence to support it. The plaintiff in error knew that Forsyth, Hyde & Co. were dealing in iron upon commission; that they were the agents of the York Iron Company; and that the iron purchased was of its manufacture. Presumably, therefore, the iron was the property of that company. For several years prior to the transaction in question the plaintiff in error purchased that description of iron of these agents with such knowledge of their agency and of the ownership of the iron. Every invoice delivered spoke to those facts and to that ownership. Ullman, the president of the plaintiff in error, who alone testifies to the question, does not pretend to deny his knowledge of the facts. He frankly states that he "had never bought any except through agency of Forsyth, Hyde & Co." It is true, he states he never had any dealings with the York Iron Company. That is true in the sense that he did not deal directly with that company, and that is the sense in which the statement is intended to be understood; for it is no less true that the plaintiff in error had for years dealt with the York Iron Company through its agents with knowledge of the agency and of the ownership of the iron. It is therefore the case of a dealing with an agent of a disclosed principal touching the property of the principal. In such case the presumption is indulged that the principal is the contracting party; and the contention of the plaintiff in error, if it can in any case be upheld, can only be applied when it clearly appears that the agent contracted on his own account, and that the plaintiff in error elected to look to the agent alone. There is not in this record a scintilla of evidence to sanction such conclusion. Nothing transpired at the time of the contract to justify such inference. It is not sustained by the fact that in previous dealings the purchase price of iron had been paid to the agents. It was·their duty, within the terms of their agency, to make such collections, and the fact of such payment does not warrant an inference that it was contemplated either by the plaintiff in error or by the agent that the principal should be ignored in the transaction. The instruction requested was therefore properly refused.

It is said, however, that, if the principal sue upon the contract made by the agent, he must adopt the precise contract made, and cannot repudiate that contract and sue in assumpsit upon an implied contract for the value; or that, if the contract be unauthorized, the principal must repudiate the contract, and sue in trover for the value of the goods. We are not called upon to pass upon the technical question of pleading which was strongly urged to our attention, for the reason that, upon the assumption of the correctness of the propo-

sition, in our judgment the evidence wholly fails to disclose any contract with Forsyth, Hyde & Co. by which as a term of the contract the iron was to be paid for by offsetting the indebtedness of Forsyth, Hyde & Co. to the plaintiff in error for the accommodation notes stated. The memorandum of sale and the invoices, so far as they speak to the contract, show that it was a sale for cash. The evidence of Mr. Ullman, the president of the plaintiff in error, shows no other or different contract. He distinctly states that the question of the payment of Forsyth, Hyde & Co.'s indebtedness to his corporation was not a term of the contract for the purchase of the iron. The fact that the bookkeeper of Forsyth, Hyde & Co., in their account with the plaintiff in error, credited the latter with the amount of the notes executed for their accommodation, and subsequently, at the time of the sale nearly a year thereafter, charged the amount of the sale to the company, does not in any degree tend to prove that it was agreed at the time of the sale that the price of the iron should be paid for by their indebtedness to the plaintiff in error. It is urged that the question should have been submitted to the jury, and that they would have a right to infer such a contract; but we think no such inference is warranted in the light of Mr. Ullman's positive statement that the two subjects were not connected. It would have been the duty of the court, if the verdict had been rendered upon the testimony adduced in favor of the plaintiff in error, to have set aside the verdict for want of evidence to support it. It may further be observed that no such contract is set up in the notice or statement of facts which the plaintiff in error gave as his defense under the general issue. The correspondence of the parties discloses no claim to any such contract, but merely the right to set off. We therefore need not inquire what would have been the rights of the principal if the contract of sale had been as is now claimed by the plaintiff in error. The contract being then as appears in the memorandum of sale and in the invoice, and having been executed, the defendant in error had a right to sue upon it, and could, under the common counts, recover the contract price. Crane Elevator Co. v. Clark, — U. S. App. —, 26 C. C. A. 100, 80 Fed. 705–710.

If the court below erred in admitting evidence of the value of the iron at the time and place of delivery, the error was harmless, and the judgment is not reversible for that reason, the amount of the recovery being for the contract price of the iron, and not for its value, which was proven to be greater than the contract price.

We do not think the situation is at all disturbed, or that the right of the principal to sue is impaired, by the transaction by which the iron was turned over nominally to the agents, and they were authorized to apply the proceeds in payment of obligations assumed for the accommodation of their principal. The agents did not thereby acquire the absolute title to the iron. It was pledged to them for a specific purpose. This pledge enabled them to hold the goods against third parties, and against the York Iron Company, but only so far as was necessary for their protection and security; and the title thereby acquired was a qualified one. The title to the iron or its proceeds was not exclusive in the agents. The right of the principal to col-

lect the proceeds of sale was not thereby impaired. Hill v. Railroad Co., 43 S. C. 461, 21 S. E. 337; Merrill v. Thomas, 7 Daly, 393; Francklyn v. Sprague, 10 Hun, 589; Balderston v. Rubber Co., 18 R. I. 338, 27 Atl. 507. If, by such an arrangement, the subject-matter became the property of the factors, and was of a perishable nature, and had been destroyed, the loss would fall upon the factors, and they would have no recourse upon their principal for payment of the obligations upon which they were bound. So, likewise, if it had been lost in transit, or had met destruction in any way. It is, we think, manifest, that they took the property under no such assumption of responsibility. Indeed, it seems to have been understood at the time of the arrangement referred to that it was a mere transfer of the possession of the property to be disposed of under the terms of the agency and the proceeds applied to the discharge of the obligations. They did not even assume the risk of the collection of sales. If there should be loss in that regard, it was to fall upon the York Iron Company, and not upon them. The relation created was that of an agency, coupled with an interest. We cannot regard the arrangement as in any degree impairing the right of the principal to collect of the purchaser the proceeds. Possibly, equity would intervene at the instance of the factors to prevent collection when the purpose for which the iron was pledged would be defeated by such collection. The agents had a special property in the iron, which was paramount to the right of the York Iron Company; but the latter company had a right of property in the iron, and could demand the application of its proceeds to the payment of its obligations upon which the agents were bound. Any appropriation of the iron or its proceeds by the agents to the payment of their debt to the plaintiff in error (with which the York Iron Company was not concerned) would have been in violation of the terms of the contract of pledge, and could not be sustained; and equally would it be wrong to permit a purchaser of the property of the principal to set off against his debt for the purchase a sum owing to him from the agent. It appears that before this suit the specific purpose for which the iron was pledged had been accomplished. The agents had paid $10,000 of the obligations. The balance of them was paid by the York Iron Company. Forsyth, Hyde & Co. had received from the sales of the iron over $20,000, and at the time of their failure were largely indebted to their principal. The purpose of the pledge being consummate, the right to the proceeds revested in the principal. The judgment will be affirmed.

SHOWALTER, Circuit Judge (dissenting). Mr. Edward C. Gale, secretary of the York Iron Company, defendant in error, and the only witness who testified on behalf of the defendant in error at the trial other than Mr. Ullman, the president of the Moline Company, the plaintiff in error, said in his testimony:

"About the middle of May, Mr. Hyde came to Minneapolis, and we authorized him to come back to Chicago, and sell as much iron as he could. The arrangement was not in writing. We told him to drop the price, if necessary, one or two dollars a ton, in order to make immediate sales. He·went to Chicago same day, and in a day or two we·received from him the letter in evidence, showing the sale to the Moline Company for 300 tons."

The relations between the defendant in error and Forsyth, Hyde & Co., up to the time of the conversation referred to by the witness, are shown by the following contract put in evidence by defendant in error:

"This agreement, made this 7th day of July, 1886, by and between the York Iron Company, of Minneapolis, Minnesota, party of the first part, and J. F. Forsyth and E. H. Hyde, of Chicago, Illinois, co-partners, as Forsyth, Hyde & Co., parties of the second part, witnesseth: That said parties of the second part undertake to act as the agents of said party of the first part in the sale of the product of the furnace of said party of the first part, situated near Black River Falls, Wisconsin, upon the terms and conditions following, viz.: (1) Said parties of the second part are to have the exclusive sale of all pig iron produced by said furnace so long as this agreement shall remain in force. (2) All sales of such iron shall be made by them as agents for and in the name of said York Iron Company, and subject to its approval, and all collections made by them on account thereof shall be at once remitted to said company at Minneapolis. (3) Said parties of the second part agree to exercise due caution in respect to the financial responsibility of all parties to whom sales are made, and shall collect all sums due from purchasers of the company's iron, whenever possible, but said second parties do not guaranty collection of accounts or paper taken in settlement thereof. In case suit is necessary or other unusual expenses are incurred in making such collections, the same shall be borne by the company. (4) In case of sales known to the iron trade as 'cash sales,' said second parties agree to honor drafts of the company at thirty days' sight. for the net proceeds of such sales. (5) Said second parties agree to exert their best endeavors to sell the products of said furnace for the best interests of said first party, and to collect and remit the proceeds thereof, and for such services they are to receive a commission of two and one-half per cent. of the net price of the iron at the furnace. Any commissions due on sales made and settled for by note or cash may be deducted by said second parties out of any collections in their hands, but, in case any sums due for iron sold shall not be collected, said parties of the second part are to return the commission charges thereon, and all commissions on sales made to stockholders of the company shall be remitted to the party of the first part. (6) Said parties, in consideration of the benefits accruing to them from this contract. agree to advance money to said first party, when desired, upon any merchantable iron made by it of the quality known as 'Lake Superior Charcoal Iron,' in sums equal to any part of its market value above three dollars per ton at per rate of interest, not exceeding seven per cent. per annum, and at a less rate when practicable. All iron upon which said advances are made shall be pledges to said second parties in the customary manner. (7) This agreement shall continue in force so long as the same may prove satisfactory to the party of the first part, and on its termination said second parties agree to promptly turn over all accounts and other property of the company to which it may then be entitled."

The letter referred to in Mr. Gale's testimony above quoted was as follows:

"Forsyth, Hyde & Company, Dealers in Pig Iron, Chicago, 68 and 70 Dearborn Street.

"Chicago, May 16, 1893.

"Messrs. York Iron Company, Minneapolis, Minn.—Gentlemen: We wired you to-day to ship to the Rockford Malleable Iron Works two hundred ton No. 2, and send to you S. M. No. 1,789 herewith for sale. We also send you S. M. 1,790 for 300 tons of soft 2 for the Moline Malleable Iron Company, at St. Charles, Illinois. You will see that the Moline concern has moved, and they are not quite ready yet to take any iron. We therefore request that you ship to Rockford first, and the Moline Company second. We send the S. M. to you, and a copy to Black River Falls. The sales are fifty per cent. better than the memorandum shipment of yesterday. Both Mr. Gaylor and Mr. Pullman were out of town yesterday, and Mr. ——, of the Malleable

Iron Company, could not be found. We hope to see .both of them to-morrow, and will close up sale for 2,000 tons possibly.

"Very truly, yours,                           Forsyth, Hyde & Co."

The S. M. (sales memorandum) No. 1,790 inclosed in the foregoing letter was in words following:

"Forsyth, Hyde & Company, Pig Iron Commission, 68 and 70 Dearborn Street, Chicago.

' "Sale Memorandum 1,790.                    Chicago, May 16, 1893.

"Messrs. York Iron Company, Minneapolis, Minn.: We have sold for your account to the Moline Malleable Iron Company, of St. Charles, Illinois, ——— cars, 300 tons soft, No. 2 Minneapolis pig iron, at $15.00 per gross ton, spot cash, f. o. b. St. Charles, Illinois, six per cent. for four months' time, deliverable at once. Notify them two days before you ship. Firm sale memorandum sent to buyer, Rhodes. Subject to possible delay from accident or other cause unavoidably delaying manufacturers. Shipment via E. J. & E., care of Chicago & Great Western Railway; rate of freight ——— per gross ton from ——— to ———.                    Forsyth, Hyde & Company.
                                              "H. Nott."

The sale in controversy was made in a conversation between Mr. Ullman, acting for plaintiff in error, and Mr. Hyde, acting for Forsyth, Hyde & Co. Afterwards Forsyth, Hyde & Co. sent to plaintiff in error the following sales memorandum:

"Forsyth, Hyde & Co., Pig Iron Commission, 68 and 70 Dearborn Street, Chicago.

"Sale Memorandum, Including all Shipping Directions Received with Your Order, No. 1,790.

"Chicago, May 16, 1893.

"Sold to Moline Malleable Iron Co., St. Charles, Ill., ——— cars, 300 tons No. 2 soft Minneapolis pig iron. Price (freight cash) $15.00 per gross ton, spot cash, f. o. b. St. Charles, Ills., privilege of 4 mos. time @ 6% int. If this lot is divided in delivery, settlement to be made for each lot promptly when delivered. If sold on time, settlement is to be by note or acceptance. Delivery to be made at once, * * * subject to possible delay from accident or other cause, unavoidably delaying manufacture or shipment. Order shipped via E. J. & E., c/o C. & G. W. N. Ry.

"[Signed]                                     Forsyth, Hyde & Co.
                                              "J. H. Mott.

"Please advise us if this is not in accordance with your understanding."

Plaintiff in error, at the time of the purchase, knew or had reason to suppose that Forsyth, Hyde & Co. would procure the iron from the defendant in error, and it is probable that they knew at that time that there was some sort of arrangement between defendant in error and Forsyth, Hyde & Co. whereby the firm handled the product of the corporation; but what the terms of that arrangement were they did not know, or seek to know, so far as appears. The testimony touching the sale was entirely by Mr. Ullman. That testimony is certainly not inconsistent with the theory of counsel for plaintiff in error that the plaintiff in error was, in fact, contracting with Forsyth, Hyde & Co. themselves, and not with them in any representative capacity. At the time of the sale, Forsyth, Hyde & Co. were indebted some $5,000 to plaintiff in error, that being the proceeds of two accommodation notes then outstanding, but afterwards paid by plaintiff in error. Mr. Ullman testified:

"The notes shown me, dated March 2, 1893, and April 15, 1893, are the notes which I gave. They were paid through the First National Bank of Moline, Illi-

nois, at maturity.  I had dealt with Forsyth, Hyde & Company, I think, ever since they were in business; that is, for a number of years.  Q. What were the circumstances under which these notes were given?  A. Mr. Forsyth asked me at one time to give him some notes which he could discount.  I told him that we owed him nothing; and he said that he needed the money, and it would be a great accommodation if I could give him that amount in notes.  I finally told him that I would do so, but I would charge it on account to Forsyth, Hyde & Company.  I purchased the iron of Mr. Hyde.  I do not remember the particular conversation we had with him further than the purchase of the iron. I had made no payments for iron bought of Forsyth, Hyde & Company prior to this time, except to them by note or otherwise.  Had never bought any except through agency of Forsyth, Hyde & Company.  I never had any dealings with the York Iron Company. * * *  Q. At the time that this iron was purchased, in May of 1893, was any reference made to these notes?  A. Yes, sir. Q. What was it?  With whom was the conversation had?  A. With Mr. Hyde. Q. Well, what was said?  A. Nothing was said except that he had those notes, and that he wanted me to take this iron in satisfaction of the notes.  Q. Are you certain about that?  A. I testified that there was nothing said about the talk about the note.  'We having the notes then,' he said, 'I want to sell you that iron.  I want to sell you 300 tons of iron;' and we took the iron and I understood— Q. Never mind what you understood; just what you said.  A. Nothing further was said about it.  Q. So there was no reference made to these notes at the time you purchased the iron?  A. There was the talk that he owed us for those notes earlier in the conversation, but there was no conversation further than that in the purchase of the iron.  We talked about his owing us for these notes, and then afterwards we went on, and talked about buying so much iron from him.  Q. But that was not my question.  A. I said there was no connection made with the purchase of the iron at that time.  There was the talk that he owed us for those notes earlier in the conversation, but there was no conversation further than that in the purchase of the iron.  We talked about his owing us for these notes, and afterwards about buying so much iron from him.  The York Iron Company was never represented when the accounts of Forsyth, Hyde & Company were paid.  So far as I know, they had no knowledge of the manner in which they were paid."

That the terms of the sale to plaintiff in error were correctly stated in the sales memorandum last above quoted was not disputed.  Plaintiff in error, not electing, when it received the iron, to give notes at four months' time, was then charged with the price in the books of Forsyth, Hyde & Co.; and, so far as concerned that firm and plaintiff in error, the iron (which was delivered in June, 1893) was paid for in full by the credit in favor of the latter.  Forsyth, Hyde & Co. failed in July, 1893.  I think the jury might have inferred from the testimony of Ullman and the bookkeeper that the price of the iron was to be offset against the credit.  I do not understand Ullman's testimony to be "positive" "that the two subjects were not connected." The insistence by defendant in error is that the sale contract of May 16th was with defendant in error, it being principal, and Forsyth, Hyde & Co. merely agents; that defendant in error, as vendor, has not been paid; and that plaintiff in error must now again pay the price of the iron.  The testimony tends to show additional matters about as follows:  On May 19th defendant in error, being advised that Forsyth, Hyde & Co. had made the sale of the 300 tons to plaintiff in error, also that they had made two other sales which would bring up the aggregate to 2,000 tons, delivered to Forsyth, Hyde & Co. that quantity of iron.  In consideration of this, Forsyth, Hyde & Co. bound themselves to pay at maturity a certain indebtedness of

$6,000 then owing by defendant in error to a third party. They also engaged to pay four promissory notes made by defendant in error, for $2,500 each, and on which they had become sureties, of which notes one had fallen due May 12, 1893, another would fall due May 20th, another May 28th, and still another on June 10, 1893. They also engaged to pay, as they matured, other obligations of the defendant in error on which they had become security, in sums of $5,000 and $2,500, aggregating altogether $20,000, and maturing at different dates in the future. The witness Mr. Gale, who alone testified on the subject, added: "If the Moline Company had failed, and the account had been lost, it was talked and understood between Mr. Forsyth and ourselves that it would be our loss. Mr. Hyde never told us about any account against the Moline Company." This means that Forsyth, Hyde & Co. took the chances of collection from Pullman and the Rockford Company. It is to be noticed, further, that defendant in error then knew that plaintiff in error had the privilege of four months' time on the purchase of May 16th. The last of the obligations which Forsyth, Hyde & Co. were to pay matured August 15, 1893. The contract of May 19th could not mean, therefore, that Forsyth, Hyde & Co. were to pay with the proceeds of the iron.

Out of the 2,000 tons so obtained by them, Forsyth, Hyde & Co. shipped the 300 tons here in question to plaintiff in error about the 7th of June, and the same was received by the plaintiff in error about 10 days later. They also delivered the remainder of the 2,000 tons, except about 105, in carrying out other sales made by them. Forsyth, Hyde & Co. paid the four notes first above mentioned, aggregating $10,000. Presumptively these notes were paid before there had been any delivery of iron to plaintiff in error. When the deliveries of other portions of the 2,000 tons were made does not appear, nor was it shown when the price of said other portions would be payable. The presumption is that Forsyth, Hyde & Co. paid the first $2,500 note as soon as the contract of May 19th was made, and each of the other three at maturity. They had paid as much as $5,000, then, by May 20th, or, at latest, by May 23d. Up to this time there could hardly have been any delivery of iron to either of the other vendees. At all events, there is no showing that the $5,000, or even the entire $10,000, or any part of it, was the price or proceeds of the 200 tons sold to the Rockford Malleable Iron Company, or of the 1,500 tons sold to Mr. Pullman. Apart from the four notes mentioned above, no other obligation included within the arrangement of May 19th matured till about the time of the failure of Forsyth, Hyde & Co. They made no further payment under the agreement of May 19th, but they did collect from Pullman and the Rockford Company, though when is not shown.

It is said, in effect, as I understand, that the 2,000 tons of iron were actually sold to the three vendees by this defendant in error; that Forsyth, Hyde & Co. were mere bailees of this iron; that, as agents of defendant in error, they had negotiated the three sales; that, as such agents, they were to collect from each vendee the price of the iron sold to him; and that the payment of outstanding obligations under the arrangement of May 19th was, in effect, but an account-

ing to their principal for proceeds which, as soon as received, belonged to such principal.     Suppose A., an agent, has negotiated sales of certain goods for and on behalf of B., his principal.     The latter puts the goods into A.'s possession, authorizing him to deliver to each purchaser the portion bought by such purchaser, and to collect the price from each.     A. makes delivery first to C., a purchaser; but, instead of receiving from C. the price in cash, it is then agreed between the two that a debt which A. owes C. shall be canceled, and A., out of his own pocket, is to pay B. a sum equal to that for which the goods were sold.     A. at once makes this payment on the agency account. Then A. makes delivery to and collects from each of the other purchasers.     These latter purchasers have now paid B., since payment to B.'s agent is payment to him; but A. becomes insolvent, and fails to account to B. for any further proceeds.     Is it law that B. may now turn on C., and force him to pay B. the price of the goods sold to him? I think not.     From the standpoint of all the vendees including C., B. has been paid in full.     He received in cash from C.'s debtor the price of the goods sold to C., and his agent received the price on each sale, respectively, from each of the other vendees.     Or, again, suppose that A., before he has made any delivery, advances to B. on his agency account, and meaning to reimburse himself out of the proceeds of the goods, a sum of money as large as or greater than the price C. is to pay.     He then makes delivery to C., and, instead of receiving the price in cash, he agrees with C. that an old debt from himself to C. be canceled, or that C. will do something for him at a future time, and the price of the goods is to be deemed paid.     A. thereafter makes delivery to and collects from the other vendees, and, becoming insolvent, fails to make any further payment to B.     May B. now recover from C.?     I think not.     He has received the price of the goods sold to C. His loss results from the default of his agent on the other sales.

In brief, on the theory of agency, the $5,000 paid by Forsyth, Hyde & Co. on or about the 20th of May was more than an equivalent for the price of the 300 tons of iron bought by this plaintiff in error. This defendant in error has already received—this, at least, would be the presumption—the price of the iron sold to plaintiff in error.     It ought not therefore to recover the same.     Defendant in error suffered no loss by reason of any failure to get value for the iron sold to plaintiff in error.     Its losses resulted from the failure of the agents, Forsyth, Hyde & Co., to account for proceeds actually received by them in their character as agents.     The case would not be different if plaintiff in error had advanced the full price in cash to Forsyth, Hyde & Co. on May 16, 1893, and the latter had thereupon, and before delivering or collecting for any portion of the iron sold to the other parties, paid and advanced on their agency account a sum equal to or greater than the price of 300 tons of the iron, and then delivered the 300 tons to plaintiff in error.     Assuming that defendant in error was vendor in the contract of May 16th, then the understanding between plaintiff in error and Forsyth, Hyde & Co. that the firm should pay defendant in error for the iron, so that plaintiff in error might settle with the firm, seems clearly inferable from the evidence. This side arrangement would probably signify nothing as against

defendant in error but for the fact that Forsyth, Hyde & Co. did at once pay on their agency account, with respect to the 2,000 tons of iron, $10,000. On the agency theory, in the absence of proof that they paid this $10,000 with proceeds received from Pullman or the Rockford Company, why shall it be said that this payment was not in response to the obligation due by the firm to this plaintiff in error? Suppose there had been but the one sale, namely, the 300 tons to plaintiff in error, and Forsyth, Hyde & Co., having agreed with plaintiff in error that they would pay the price to defendant in error, did so pay; could defendant in error afterwards recover the price again from plaintiff in error?

But I do not think this defendant in error was or ever became the vendor in the sale contract of May 16, 1893. It was a term in that contract that the vendee (plaintiff in error), when it received the iron, might, instead of paying cash, give notes at 6 per cent. payable in four months. This defendant in error never authorized Forsyth, Hyde & Co. to make on its behalf any such contract. By the writing of July 7, 1886, Forsyth, Hyde & Co. had no authority to make any contract of sale at all. The scheme by that writing was that Forsyth, Hyde & Co. would report orders, and, when approved and accepted by defendant in error, the sale was made. Defendant in error then delivered the iron, and Forsyth, Hyde & Co. collected the price, and accounted for the same, less their commission. I do not see that the conversation testified to by Gale was meant to change the contract in any way. Certainly, that talk was no authority to Forsyth, Hyde & Co. to conclude a sale on four months' time. When, therefore, Forsyth, Hyde & Co., on the 16th of May, made the sale to plaintiff in error, they alone were bound. They were bound to obtain iron and deliver it. There was no agency in the case; nor did defendant in error ever assume by ratification or in any other way to become the principal or vendor in that contract. The arrangement of May 19th, as testified to by Gale, does not by any kind of necessity have any such meaning. By that arrangement, Forsyth, Hyde & Co. themselves, for valuable consideration, then took the title to the 2,000 tons of iron. Plaintiff in error had no notice of that arrangement. It is conceivable that, as against a third person dealing with the 2,000 tons or some part thereof as a mere volunteer or with notice, a constructive trust in favor of defendant in error might have been declared in a court of equity. But here the rights of defendant in error are determined by the contract. The proceeds of the iron when and as received did not necessarily become, in the hands of Forsyth, Hyde & Co., the money of defendant in error. It was their own money. They were to take up certain outstanding commercial paper when and as the same fell due. For this engagement by them, defendant in error parted with the iron. There was no relation of principal and agent between defendant in error and Forsyth, Hyde & Co. so far as concerned the sale of the 300 tons of iron to this plaintiff in error, prior to the treaty of May 19, 1893; and it was not necessary, in order that the terms of that treaty be carried out, that defendant in error become or be treated as vendor in the contract whereby plaintiff in error bought the 300 tons of iron. All this on the assumption that,

as against plaintiff in error, it was possible, by some ex post facto agreement between Forsyth, Hyde & Co. and defendant in error, of which plaintiff in error had no notice, for this defendant in error to become principal and vendor in the contract last named. The theory of ratification presupposes, as beyond question, that, within the intent of plaintiff in error, defendant in error was vendor in the contract of May 16th. But I do not so understand the record. If Forsyth, Hyde & Co. had been in fact authorized to make that contract, then the evidence, it may be contended, would not affirmatively and distinctly exclude a possible understanding by plaintiff in error that defendant in error was really vendor. But Forsyth, Hyde & Co. were not so authorized. There is no basis for the theory of ratification. I am not able to see that defendant in error sold to plaintiff in error the 300 tons. It ought not therefore to recover the price.

The court instructed the jury: "The only question before you is the question as to whether or not the plaintiff has proved that, through these agents, they did sell and deliver to the defendant the pig iron that is sued for. If so, you may find a verdict for the plaintiff for the value of the iron at the time and place of delivery," etc. The record shows that the counsel for defendant "excepted to so much of said charge as directed the jury that the only question was as to whether plaintiff shipped to defendant certain pig iron in suit, and its value." The counsel for defendant also requested the court to charge the jury that "if they believe from the evidence that exclusive credit was given by defendant to Forsyth, Hyde & Company, and it contracted with them exclusively in respect to the iron to recover the price for which suit was brought, then plaintiff could neither sue nor be sued upon such contract." This request the court refused, and exception was duly taken and allowed. In other words, upon the theory which prevailed in the circuit court, the relation of principal and agent, as between the defendant in error and Forsyth, Hyde & Co., was assumed as beyond question. I think this judgment is error, and that the same ought to be reversed.