BAUMHAUER v. AUSTIN.

(Circuit Court of Appeals, Fifth Circuit. April 11, 1911.)

No. 2,103.

1. BANKRUPTCY (§ 340*)—CLAIMS—RELATIONSHIP BETWEEN BANKRUPT AND CREDITOR.

That a claimant of a bankrupt is closely related to him is a circumstance justifying a more rigid scrutiny than is the case where no such relationship exists, but the honest or dishonest character of the claim may not be determined by any mere question of relationship.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 340.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**2.** BANKRUPTCY (§ 342½*)—FINDINGS OF REFEREE—CONCLUSIVENESS.

The court is not bound by the findings of the referee in bankruptcy on a question of fact based on inferences drawn from the evidence.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 342½.*]

**3.** BANKRUPTCY (§ 340*)—ESTABLISHMENT OF CLAIMS—ORDER FOR PRODUCTION OF INSTRUMENTS.

Proceedings in bankruptcy to require a claimant of the bankrupt to produce instruments on the hearing of his contested claim are summary, and the party must comply with such orders lest he meet a rule for contempt.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 340.*]

**4.** BANKRUPTCY (§ 340*)—CLAIMS—EVIDENCE.

Evidence in bankruptcy *held* to support a claim for borrowed money, necessitating a reversal of the findings of the referee affirmed by the District Court, rejecting the claim in part.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 340.*]

**5.** BANKRUPTCY (§ 340*)—CLAIMS—PROOF OF CLAIM.

A proof of claim in bankruptcy in the form prescribed by Bankruptcy Act July 1, 1898, c. 541, § 57, 30 Stat. 560 (U. S. Comp. St. 1901, p. 3443), is testimony in support of the claim, and, in case of contest, the claimant who is present is subject to call by the court or contestant for explanation in the nature of a cross-examination, and the claimant's silence when he is not called on for an explanation does not justify an inference against him.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 340.*]

Error to the District Court of the United States for the Southern District of Alabama.

In the matter of William C. Baumhauer, bankrupt. From an order of the District Court (179 Fed. 966) affirming an order of the referee disallowing a part of the claim of J. H. Baumhauer, he appeals. Reversed and remanded.

William C. Fitts and Norville R. Leigh, Jr., for appellant.

Robt. H. Smith, for appellee.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

McCORMICK, Circuit Judge. On March 16, A. D. 1909, on the application of creditors, William C. Baumhauer was adjudged a bankrupt by the District Court for the Southern District of Alabama. The appellee, W. G. Austin, was duly appointed trustee of the bankrupt estate. On April 6, 1909, J. H. Baumhauer made proof of claim in due form against the estate of the bankrupt for the sum of $15,220, stating in his affidavit:

"That the consideration of said debt is as follows: Money loaned and advanced by the deponent at divers times to said W. C. Baumhauer, * * * evidenced by a certain promissory note executed and delivered to this deponent by the said W. C. Baumhauer on, to wit, the 16th day of April, 1908. * * * Said note is hereto attached and filed herewith."

The transcript of the record does not show the dates of the subsequent proceedings until February 10, 1910, which is the date of the referee's opinion and decree, but at some time between these dates this minute appears:

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

"Comes William G. Austin, trustee in bankruptcy in the above-entitled cause, and contests the claim of J. H. Baumhauer, heretofore, on April 7, 1909, filed with the referee in said cause, which said claim amounts to $15,-220, and moves the referee to disallow said claim upon the ground that the amount claimed is not due to the said J. H. Baumhauer by the said bankrupt, and that the note attached to the claim and forming the basis thereof is without consideration."

Then follows in the transcript "a stenographic report of testimony introduced on hearing of contest of the claim filed by J. H. Baumhauer in the matter of W. C. Baumhauer, bankrupt, in bankruptcy." "Examination of the witnesses on the objections of the trustee to claim of J. H. Baumhauer." Claimant offered his claim and then rested. Then follow 85 printed pages of the reported testimony, when we reach the opinion and decree of the referee dated, as before said, February 10, 1910, and filed March 29, 1910. It is in these words:

"This matter comes on to be heard on the objections filed to the claim of J. H. Baumhauer.

"In this cause it is shown by the evidence that J. H. Baumhauer kept an account at the People's Bank in which were kept considerable sums of money; that he drew on this account regularly just before the pay checks of the M. & O. Railroad Company were issued each month a sufficient amount to cash such checks as might be issued to such employés of the railroad as dealt with him. These checks running up to as high as $2,000 in some months.

"It is further shown that his practice in this connection was to cash the check of his customer, taking out such amount as might be due him, and pay the balance in cash to such customer.

"It is also shown that various parties had seen at sundry times large sums of money in the possession of J. H. Baumhauer, sometimes in his safe and sometimes in his cash drawer.

"It is further shown that J. H. Baumhauer was a man of considerable means, and possessed of a considerable amount of ready cash at all times.

"J. H. Baumhauer resided and did business in Whistler, Ala., while W. C. Baumhauer, the bankrupt, did business in the city of Mobile, Ala. It is further shown that they were brothers.

"It is also shown that W. C. Baumhauer kept his bank account with the First National Bank of Mobile, and an examination of the original deposit slips offered in evidence shows that no considerable amount was deposited by W. C. Baumhauer at any time during the period it is claimed that the money evidenced by the note was loaned by J. H. Baumhauer to W. C. Baumhauer. The claimant, J. H. Baumhauer, offered in evidence his claim and the original note, but did not testify as a witness himself, but examined W. C. Baumhauer, the bankrupt. The contestant upon the close of claimant's case without J. H. Baumhauer having been placed upon the stand offered in evidence certain checks which had been produced by J. H. Baumhauer in response to a demand of the contestant asking for his checks upon the People's Bank. An examination of these checks will show that the letters 'W. C. B.' were written in the lower left-hand corner of the check, and in each instance this lettering seems to be in a different ink from that in which the check was written.

"W. C. Baumhauer testified that the amounts loaned him by J. H. Baumhauer were always in cash and never by check, and that these letters were not placed on these checks by him. With the exception of two items, which the evidence shows were sent to W. C. Baumhauer for J. H. Baumhauer through one Bancroft amounting to $1,000 and $1,200 respectively, there is no evidence of any other loans than the testimony of W. C. Baumhauer, and under it all the other sums were handed him in cash by his brother in Whistler. He testifies that, when he wanted money, he would go out to see his brother, and sometimes would get the cash when he first went, but generally he would make it known to his brother what cash he wanted, and a day or so after that would come again and get the money.

"It is further shown that there is no bank in Whistler. According to the story of W. C. Baumhauer, this whole sum of $15,220 was loaned him by J. H. Baumhauer from January, 1907, to April, 1908. He says that on one occasion he got as much as $2,500, but is unable to give any dates as to when he got this or any other item from his brother, and, in fact, the only two items which are definitely traced to him are those shown by the testimony of Bancroft in January, 1907. It is inconceivable to me that this much money could have been turned over in cash during this period of time by J. H. Baumhauer to his brother without more definite information being furnished as to the amounts and times.

"Bearing in mind that W. C. Baumhauer resided in the city where the banking business of J. H. Baumhauer was done, and that J. H. Baumhauer kept a large account during this period of time in the bank, the most natural thing in the world would have been for him to draw a check and give it to his brother, who could then have cashed it, instead of having this brother come twice for the purpose of getting the money, once to notify him and the second time to get it in cash and return to the city with it. Both these parties were business men, familiar with the practice of using the banks in their dealings, both keeping bank accounts, and, when the relationship between them is considered, it seems to me that the explanation of the methods in which these loans were made is weak and unsatisfactory. The further fact that W. C. Baumhauer would call ordinarily and notify his brother of what he wanted, and would then have to come again to get the cash, indicates that the brother did not then have the cash, but must have drawn it from some other source in order to furnish it to W. C. Baumhauer.

"Keeping the bank account in which he had large balances as he did, the most natural way would have been to draw it from this account, and yet there is no pretense that this was done. On the contrary, under the evidence, it apparently was not done, and I am asked to find that one brother furnished another under these circumstances with this large sum of money without ever resorting to his bank account in order to do it. Considering the ease with which a fraud could be committed in the manner testified to by W. C. Baumhauer, and which is wholly contrary to the method pursued by business men, I am forced to the conclusion that the loans were not made in this manner.

"It is a hard case to decide under either aspect, because on the one side appears to be all the natural and reasonable methods in which such matters would have been conducted, and which would have furnished simple, definite, and positive evidence of the facts, while, on the other, the circumstances of the story would be so easy of fabrication and utterly impossible for the contesting creditors to ever break down the story told. While I am loath to find against the positive and direct testimony of W. C. Baumhauer that this money was loaned, I feel constrained to do so.

"Before the hearing of this case, the contestant served on claimant a notice to produce all claimant's checks on the People's Bank during a certain period, and on the hearing of this motion claimant's attorney objected to the order being made, and I ruled that they would not be required to produce all the checks, but only such of them as it was claimed went to W. C. Baumhauer, or that the cash represented by them went to him, and, on the hearing of this cause, certain checks were produced by J. H. Baumhauer in response to this motion. I feel that the circumstances of the production at the beginning of this hearing of the checks by J. H. Baumhauer, many of them bearing the initials 'W. C. B.' in the lower left-hand corner, were undoubtedly intended to lead the contestant to believe that these checks furnished the money which went to W. C. Baumhauer, such checks aggregating $6,900 bearing these initials, while the checks aggregating $5,075 so produced have no such initials upon them.

"The fact that these checks were produced in response to the notice, taken in connection with the further fact that J. H. Baumhauer was not put upon the stand to testify to the facts, though he was present during the whole examination, and the circumstances of the story told as to how the loan was made, taken in connection with the other evidence in the case, made a case which in my opinion calls for corroborating testimony and explanations of

these circumstances which J. H. Baumhauer ought to have been able to give, and I admit frankly that these matters influence me in the conclusion I reach.

· "It is therefore ordered that the claim of J. H. Baumhauer be and the same is hereby disallowed as to the note, but I allow the claim for the amounts shown by Bancroft to have been loaned, viz., $2,200, with interest from January, 1907."

On application of the claimant, the proceedings had were on the 20th of March, 1910, certified to Judge Toulmin, of the District Court, who on June 3, 1910, entered his order affirming the action of the referee (179 Fed. 966), accompanied by the following opinion:

"It is the recognized rule of the courts of bankruptcy that, on review of the decision of a referee based upon his conclusions on questions of fact, the court will not reverse his findings, unless the same are so manifestly erroneous as to invoke the sense of justice of the court—[citing and quoting from authorities].

"The contention of the claimant is that he, having filed his claim properly verified, made out his case, and that he should have been allowed his entire claim. It is true that the claimant filed a formal proof of claim against the bankrupt estate, and it is also true that this proof of claim is prima facie evidence that the allegations made therein are correct, and this prima facie evidence must prevail until it shall be properly and successfully attacked—[citing and quoting from authorities]. In the case at bar the claimant, though present at the hearing, did not testify, but the bankrupt did testify in behalf of the claimant. The referee had the opportunity to see and hear him and observe his manner while testifying, which is an advantage of great value in cases of this character. This witness' testimony is in some material respects vague and uncertain, if not evasive. He stated that he borrowed $15,000 from the claimant at divers times and in divers amounts from January, 1907, to April, 1908, but that he did not remember the specific dates or months in which he obtained the money, nor did he remember the specific amount he got each time or at any one time, except in one instance when he borrowed $2,500, the date of which he did not remember. He testified that he was a merchant and kept a cash book, but did not enter the cash obtained on said various loans on said book or keep any memorandum of them: that he made a note for each loan when obtained, which was taken up and destroyed when the note for the next succeeding loan was made, the amount of the prior loan or loans being included in the last note made, and that the note for $15,220 now claimed to be due included all said prior loans. He also stated that said alleged indebtedness is not shown anywhere on his books.

"On these facts and circumstances, and other facts and circumstances of probative force shown by the evidence and particularly pointed out and considered by the referee, as appears in his opinion filed in this case, his conclusion was that the claimant had not established his claim as made, and the same was disallowed by the referee as to the full amount claimed.

"It is contended that the claimant's formal proof of his claim and the bankrupt's positive testimony as to the particular fact that the former loaned to the latter the amount of money claimed being uncontradicted by any one, the claimant is entitled to the full amount of his claim, and that the same should have been allowed; and it may be said that, to justify the referee's finding, he must have disbelieved both the claimant and the bankrupt. While it is true that the positive testimony of an uncontradicted witness cannot be disregarded by the referee or the court arbitrarily or capriciously, yet there may be such a gross or such an inherent improbability in the statements of the witness in reference to the fact testified to as to discredit him, and to induce the court or referee to disregard his evidence in the absence of any direct conflicting testimony—[citing and quoting from authorities].

"I cannot assume that the referee acted arbitrarily in refusing to believe the testimony of any witness; and no evidence produced convinces me that he was wrong in his conclusions in this case. His findings and order are affirmed."

The claimant appealed and assigned errors to the effect that the District Court erred in rendering the decree appealed from. .

[1] As applicable to the opinion of the referee and of the distinguished district judge, we quote the following language from the opinion of Circuit Judge Lurton in Ohio Bank v. Mack, 163 Fed. 155, 89 C. C. A. 605, 24 L. R. A. (N. S.) 184:

"The fact that the bankrupt is closely related to a creditor is a circumstance which justifies a more rigid scrutiny than would be the case if no such relation existed. Nevertheless the honest or dishonest character of a debt is not to be determined by any mere question of relationship—[citing cases]. * * * No arbitrary rule can be laid down for determining the weight which should be attached to a finding of fact by a bankrupt referee. His position and duties are analogous, however, to those of a special master directed to take evidence and report his conclusions, and the rule applicable to a review of a referee's finding of fact must be substantially that applicable to a master's report—[citing cases]. * * * Much in both cases must depend upon the character of the finding. If it be a deduction from established fact, the finding would not carry any great weight, for the judge, having the same facts, may as well draw inferences or deduce a conclusion as the referee. But, if the finding is based upon conflicting evidence involving questions of credibility and the referee has heard the witnesses much greater weight naturally attaches to his conclusion, and the weight of authority is that the district judge, while scrutinizing with care his conclusion upon a review, should not disturb his finding unless there is most cogent evidence of a mistake and miscarriage of justice—[citing cases]."

[2] On the same subject we quote the language of Judge Lowell in Re Swift (D. C.) 118 Fed. 349:

"No precise quantitative weight is in this district assigned to the findings of fact made by a referee. If those findings are based largely upon the good or bad faith of witnesses seen and heard by the referee, this court will always bear in mind that the referee's means of judgment are in an important respect better than its own. If, on the other hand, the findings depend upon inferences to be drawn from admitted facts, this court's means of judgment are nearly as good as the referee's. The weight to be assigned to the referee's findings in the two cases supposed is by no means the same. No labor-saving formula will determine the weight of the finding, or show just how strongly the court must incline against it in order to reverse it. To say that the finding should not be set aside unless it is 'clearly erroneous,' 'manifestly erroneous,' 'so manifestly erroneous as to invoke the sense of justice of the court,' or 'unless it discloses prejudicial errors by the referee, some of which may, without exaggeration, be denominated gross' is to darken counsel, if more is meant than that the court will not set aside the finding unless it is deemed erroneous after due allowance for the circumstances under which it was made. Artificial and quantitative presumptions of fact are foreign to the spirit of the common law, and the introduction of these presumptions has been rare and unfortunate."

On the same subject, in Re People's Department Store Company (D. C.) 159 Fed. 287, Judge Hazel said:

"Nor is the court bound by the conclusions of the referee because the witnesses appeared before him and gave testimony. The evidence is not in serious conflict, and the conclusions are principally based upon inferences to be drawn from a peculiar state of facts. The inferences drawn by the referee are not thought to be sufficiently supported by the evidence, and therefore there can be no valid objection to a decision based upon the facts and circumstances according to the judgment of this court—[citing In re Swift]."

In the printed brief which the counsel for the appellee submitted to us it is stated that the appellee's contention is that the bankrupt

did not borrow the $15,220 from his brother, the appellant, but that the bankrupt and appellant entered into a scheme to defraud the creditors of the bankrupt estate by having a large claim allowed to the appellant, and that in furtherance of this scheme the bankrupt signed the note and antedated it, and that the appellant then filed with the referee a claim duly sworn to and based upon this note.

It appears from the proof that the claimant and the bankrupt are brothers; that their parents resided at Whistler when claimant was born; that he has resided there all his life. The witness W. H. Smith has resided there even since 1870, and worked there for the father of these brothers before the appellant was born. Whistler is a suburb of Mobile.. The shops of the Mobile & Ohio Railroad are located there. It is a considerable village. The mother of these brothers is still living in Whistler, and is a woman of comparative wealth. The appellant is its leading merchant doing a general merchandise business. The witness Bancroft testified that whatever any one there wants he can get at appellant's store, and whatever any one has to sell, for cash he can sell to appellant. He keeps an active bank account with the People's Bank in Mobile. During the last six months of 1906 his monthly balances in that bank averaged near $6,000 each month. Before the 1st of January, 1907, the bankrupt was established in the city of Mobile as a merchant and manufacturer of candy. He was doing and had been doing a large business. He kept an active bank account with the First National Bank of Mobile, and was able on the 1st of January, 1907, to owe that bank between $12,000 and $14,000. About this time, he began to get assistance from his brother, the appellant. The bankrupt continued his business and continued keeping his bank account with the First National Bank until the close of the year 1908, when his stock of merchandise and his candy manufacturing plant were totally destroyed by fire. He had insurance on his property, but the companies made some trouble about the condition in which his books were found. He employed the appellee, W. G. Austin, who appears to be an expert accountant, to go· through and arrange his books to see if the difficulty of the companies could not be met. The result was that on the advice of this expert accountant and of the bankrupt's counsel he made a composition with the insurance companies receiving. 60 per cent. ·of the amount they had written. Thereupon, under date of the 27th of February, 1909, he notified his creditors in writing that, in view of the fact that he had suffered a great loss very recently by fire, he was unable to pay his creditors in full and offering to pay 40 per cent. on the amount which he owed, for which he would want a receipt in full. His proposition was not accepted, and on March 9, 1909, certain creditors filed their application in the District Court of the Southern District of Alabama to have him declared a bankrupt. On this application the adjudication was made. On April 6, 1909, the appellant made his proof of claim and the next day he filed the same with the referee. Thereafter (date not given) the appellee presented to the referee in writing his objections to the allowance of the claim. The issue came to hearing before the referee (date not shown) and claimant offered his claim and rested. The appellee proceeded to offer proof. He first offered

the bookkeeper of the First National Bank (in which the bankrupt kept his account), who stated he had access to the books of the bank, had been through the deposit slips from January 7, 1907, to April 30, 1908, and that the deposit slips offered him for identification were all the deposit slips of the bankrupt for that period. Appellee then called the local manager for R. G. Dun & Co., who stated that on the 1st of March, 1908, he called on Mr. Baumhauer, the bankrupt, for a statement of his affairs, and he (Mr. B.) was on his books at the time, and he called off a copy of what he claimed was an inventory just completed, and, as he called off, the witness put down the figures, and subtracted the liabilities from the total assets, and went back to his office and dictated the figures to the typewriter from this memorandum book, and, eliminating totals, these are the figures:

| | | |
|---|---|---|
| States city accounts receivable | $ 5,698 | 20 |
| States county accounts receivable | 12,649 | 55 |
| Bills receivable | 675 | 00 |
| Horse and wagon | 1,600 | 00 |
| Stock and merchandise | 22,000 | 00 |
| Fixtures | 1,000 | 00 |
| Fixtures in retail store | 1,000 | 00 |
| Stock in retail store | 1,000 | 00 |
| Machinery, etc. | 750 | 00 |

Liabilities.

| | | |
|---|---|---|
| Accounts | $10,849 | 00 |
| Owe bank | 8,000 | 00 |
| Note | 2,873 | 00 |

Appellee showed by very numerous witnesses (12 or more) the manner of dealing with the employés of the railroad shops in Whistler, the result of which was to show that the railroad employés in Whistler were paid by checks, and that the appellant kept always on hand at the time these checks were being handled funds ample to cash such as were presented to him for discount, and did cash the same without charging any premium thereon, but deducting therefrom any store account which the payee of the checks owed him.

Appellee then brought six witnesses to attack the character of the appellant for truth and veracity. The result of their examination, coupled with that of the rebutting witnesses called by the appellant, did not furnish ground, in the opinion of the referee, to support his findings on the claim, as he makes no reference to this feature of the case in his opinion which we have copied above.

After the appellee was through offering testimony in chief the appellant called Prof. Bancroft, and omitting immaterial questions, the professor testified as follows:

"Q. Were you at any time in the year 1907 the bearer of any sum of money in actual cash from J. H. Baumhauer to his brother W. C. Baumhauer? A. On two occasions when Mr. Baumhauer was sick with rheumatism. It was just before he left for Hot Springs, Ark. I believe that was in the early part of 1907, but it was between the 1st of January and the latter part of March. I brought two sums of money to Mobile from J. H. Baumhauer to his brother and delivered it to W. C. Baumhauer, and took his receipt for it. Q. What was the first sum of money? A. One thousand dollars in greenbacks. It had a rubber band around it. Q. You brought it from one to the other. Was anything said about tearing up an old note, and making a

new note? A. Now the message was: 'This is the money I promised to get to you to-day.' Told me to explain to his brother that he could not come. Q. You just simply said: 'This is the money I promised to you to-day'? A. Yes, sir. Q. How many weeks after that was it that you became the bearer of the second amount? A. I don't remember. Q. About how many? A. About two or three weeks. The first time was on a Sunday, the second time it was on a week day, because Mr. Baumhauer sent the order boy at the school for me to come around to his store, and he asked me if I was going to town that day, and said he wanted me to do the same thing for him I did a short while back, and this time I took down $1,200. Q. Was that in bills? A. Yes, sir. Q. And you delivered it to W. C. Baumhauer? A. Yes, sir. Q. Did you deliver it to his store? A. Yes, sir; the place on Dauphin street next to Damrich's."

Appellant also called the bankrupt, who testified, touching the note in question, that he signed that note in Mobile on the 16th day of April, 1908; that at the date of the execution of that note he owed J. H. Baumhauer the amount of money evidenced by the note; that he owed him for money borrowed at different times; that he made the first borrow in the early part of January, 1907, and continued borrowing from then on, and that each time when he made a borrow he gave his brother a new note; that his brother would bring the old note down, and the witness would just add the amount of the old note and accrued interest to the amount of the new loan and put this sum in the new note; that, when he made a new note including the old one and the new loan, he destroyed the old note; that he borrowed from $500 up to $1,000 and $1,500 and $2,500; that sometimes he went out to Whistler to get the money, and sometimes his brother came to Mobile and brought it, and on two occasions Mr. Bancroft brought it; that it was never given in a check, but always in money; that he spoke to his brother about it two or three days before each borrowing; that he used the money in his business, kept some of it at home, and some of it in the bank; that he used part of it in making payments on a note he owed the First National Bank; that in 1907 he owed that bank between $12,000 and $14,000, and wanted to reduce that indebtedness; that when he got the money from his brother, Jake, he just used it as he needed it to pay on his city bills and the like; that he kept a checking account in his bank; that frequently drafts came in on him, and he cashed them out of the money that he had got from J. H. Baumhauer; that he kept a cash book, but did not keep a correct book; that he did not put any of the money he got from his brother in that cash book, but put it in his safe and used it as he wanted to; that he did not keep any account with his brother about these transactions, but just let the note keep the account; that he did not include the note held by his brother in the statement made to Dun's agency because he did not think it was necessary, he knew his brother was not going to press him; that, when Prof. Bancroft brought his money from his brother, he gave the professor a receipt for it, and, that when the next note was made, the amount received from Prof. Bancroft was carried into the new note; that his brother brought the old note and the receipt the witness had given to Bancroft when the next loan was made; that the note given in April, 1908, included all the money loaned by his brother to him during this period of borrowing; that in April, 1908, witness was told by appellant that

he had let witness have all that he could let him have; that, while the witness was getting this money from the appellant, "I would notify him I would like to have some money, and in a day or two I would tell him how much, and he usually brought it in to me—that is, if I didn't go out there"—that there is nothing in this note except borrowed money and accrued interest at the legal rate of 8 per cent.

"By Mr. Ervin (the referee): Q. What did you do with your previous notes? A. I would tear them up. Q. When did you begin borrowing money from your brother? A. In January, 1907. I had borrowed some before. Q. But you didn't owe him anything before January, 1907? A. No, sir. Q. Have you any recollection of the amounts and the dates? A. I got from $500 up to $2,500. Q. Do you remember what you got in January? A. No, sir. Q. Do you remember any particular amount and the month? A. No, sir. Q. Whose handwriting is the 'W. C. B.' on these checks? A. That is not mine I know.

"By Mr. Smith: I offer all checks in evidence.

"(Objection by Mr. Fitts on the ground the same is irrelevant and immaterial, and there is no contention that they were given to Mr. W. C. Baumhauer; that they represent the amounts of money which were loaned by J. H. Baumhauer to W. C. Baumhauer, and are simply isolated checks out of the general transactions of Mr. J. H. Baumhauer.)

"By Mr. Smith: In reply we will state that the order of the court required Mr. Baumhauer to produce the checks and in response to that demand of the court these checks were produced.

"By Mr. Ervin (the referee): My recollection of that matter was this: There was a request for the production of checks when that matter was heard, and I stated I would not require all of the checks during this period to be produced, but I thought the objecting creditors would have a right to have the checks which were thought to have been used for the benefit of W. C. Baumhauer to be produced, and Mr. Leigh (counsel for the appellant) said that he expected to produce and use certain checks on the hearing and would produce those checks.

"The checks now offered signed by J. H. Baumhauer dated March 30, 1907, June 15, 1907, July 15, 1907, August 15, 1907, August 16, 1907, August 17, 1907, September 13, 1907, November 14, 1907, December 13, 1907, February 14, 1908. (Objection by Mr. Fitts because it is irrelevant and immaterial and shows no light on this question. Objection overruled.)"

In his opinion the referee says:

"Before the hearing of this case the contestant served on claimant a notice to produce all claimant's checks on the People's Bank during a certain period, and on the hearing of this motion claimant's attorney objected to the order being made, and I ruled that they would not be required to produce all the checks, but only such of them as it was claimed went to W. C. Baumhauer, or that the cash represented by them went to him, and on the hearing of this cause certain checks were produced by J. H. Baumhauer in response to this motion. I feel that the circumstances of the production at the beginning of this hearing of the checks by J. H. Baumhauer, many of them bearing the initials 'W. C. B.' in the lower left-hand corner, was undoubtedly intended to lead the contestant to believe that these checks furnished the money which went to W. C. Baumhauer, such checks aggregating $6,900 bearing these initials, while the checks aggregating $5,075 so produced have no such initials upon them."

If the notice served on the claimant was in writing, no copy of it appears in the transcript. It seems evident that no minute of the exact terms of the referee's order to produce checks was made at the time the order was made, and the record we have of this matter "is in some material respects vague and uncertain, if not evasive."

[3] Such proceedings in bankruptcy are summary, and it behooves parties to be wary in complying with such orders lest they meet a rule for contempt. The 10 drafts in question were written in 1907. (The originals are before us.) The order to produce them could not have been made before March 16, 1909, and probably was made just before entering on the hearing of this case in which they were offered. If the letters "W. C. B." were put upon these checks for the purpose that the referee imputes to the act of producing them, the writing of these letters would necessarily be fresh and bear other features of fabrication besides seeming to be in different ink from that in which the check was written. No expert in handwriting was called to testify as to the difference in the color of the ink or the age of the writing or any other features of these papers that he could translate into evidence that might be used against the claimant. Our skill is not equal to the task of settling the exact terms of the referee's order on the claimant to produce checks. Our eyes, which are somewhat aged, see through glasses darkly, and are untrained to detective work on chirography, do not discover on the lower left-hand corner or anywhere on these drafts any evidence of their manufacture which coupled with their production under the circumstances in which they were produced is injurious to the claimant or excites in us any suspicion against him.

An overwhelming array of figures and deposit slips taken from the respective banks in which the brothers did business is presented and is pressed on our attention, and doubtless was on that of the referee, to show how easy and natural it was for the claimant to have gotten the money which he let his brother have from his bank in Mobile, and counsel insist they show conclusively that the money he did get on these 10 checks from his bank in Mobile he did not use in whole or in part in furnishing money to his brother during the 16 months that his help to his brother was being extended. Our knowledge of the hidden mysteries of scientific commercial bookkeeping is not large, but it is sufficient to satisfy us from an examination of this flood of figures that they do not show that no part of the money which the claimant got from his bank was used to aid his brother; nor do they tend to show, as we read them, that the testimony of the bankrupt as to the manner and the extent in and to which the claimant gave the bankrupt aid from the 1st of January, 1907, to the 16th of April, 1908, and in consideration of which the note attached to the proof of claim was executed and delivered in Mobile on the 16th of April, 1908, is not true, much less that it is unthinkable that such transactions could occur between such parties.

[4] We cannot concur in the inferences which the able referee drew from the established facts in this case. In our opinion the proof is ample that the claimant had abundant means in ready money to let his brother have approximately $1,000 a month for 15 months without drawing on his bank at all if he so chose not to draw. It is clear to us that the referee and the learned judge failed to allow adequate probative force to the claimant's proof of claim: Whitney v. Dresser, 200 U. S. 532, 26 Sup. Ct. 316, 50 L. Ed. 584. It is also clear that the referee and the judge did not give sufficient corroborative weight

to the testimony of Prof. Bancroft. 3 Wigmore on Evidence, § 2042, p. 2723 et seq.

[5] The claimant's case did not lack his testimony in his own behalf. At every stage of the trial it had that testimony to the full extent and in the exact form prescribed by the statute. Act July 1, 1898, c. 541, § 57, 30 Stat. 560 (U. S. Comp. St. 1901, p. 3443). The verification of the proof of debt is in no true sense an ex parte affidavit. In case of contest, as here, the claimant is subject to call by the court or the contestant for explanations in the nature of a cross-examination, and would not be permitted to decline to answer any proper question propounded by the court or referee or by the contestant. The claimant was present to answer such a call. He was not called. And this failure to call him more than answers the inference sought to be drawn from the claimant's so-called, but miscalled, silence.

We conclude that the District Court erred in rejecting any part of the appellant's claim, for which error the decree of that court must be reversed and this case remanded to the court below, with instructions to allow the full claim, and award the costs in that court and in this court in favor of the claimant and against the contestants.

And it is so ordered and decreed.