## In re BLANCHARD.

(District Court, D. New Jersey. October 14, 1918.)

1. BANKRUPTCY ⬮228—FINDINGS OF REFEREE—REVIEW.

A finding of fact by a referee on conflicting evidence will not be disturbed, unless there is cogent evidence of mistake; but, if the finding be a deduction from established facts or uncontradicted evidence, it is not entitled to such weight.

2. BANKRUPTCY ⬮340—PROVABLE CLAIMS—EVIDENCE.

Evidence *held* insufficient to support a finding that claimant lent stock directly to her sons, one of whom was the bankrupt, rather than to a

⬮For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

corporation of which she and they were stockholders, and by which the stock was pledged.

3. PRINCIPAL AND AGENT ⬤➾136(2)—LIABILITIES OF AGENT—ACTING FOR DISCLOSED PRINCIPAL.

Where an agent acts on behalf of a disclosed principal, his acts and contracts, within the scope of his authority, are, in the absence of an express agreement otherwise, the acts and contracts of the principal, and involve no personal liability on the part of the agent.

4. BANKRUPTCY ⬤➾340—ALLOWANCE OF CLAIMS—CLAIMS BY RELATIVES.

Claims of relatives of a bankrupt should be closely and carefully scrutinized, and not allowed, unless the evidence is clear and convincing.

5. PLEDGES ⬤➾1—ACCOMMODATION PLEDGE—RIGHTS OF PLEDGOR.

Property pledged by the owner to answer for the debt or default of another occupies the position of a surety.

6. BANKRUPTCY ⬤➾314(1)—PROVABLE CLAIMS—COSURETY OF BANKRUPT.

Claimant, who lent stock to a corporation of which she and three sons, one of whom was the bankrupt, were stockholders, which stock the company pledged to secure its note, indorsed by the sons, on insolvency of the company and her purchase of the note to save her collateral, *held* entitled to prove one-fourth the amount paid against the bankrupt estate, on the ground that as between themselves the stock pledged and the indorsers were cosureties.

In Bankruptcy. In the matter of Theodore C. E. Blanchard, bankrupt. On petition to review an order of the referee, to whom this matter was referred, dismissing a petition of the trustee to re-examine and reduce the claim filed against the bankrupt's estate by Emeline C. Blanchard, and allowing the same, as a general unsecured claim against the estate, in the sum of $297,719.26. Reversed in part.

Robert H. Southard, of Newark, N. J., for trustee.

Albert C. Wall, of Jersey City, N. J., and William F. Allen, of New York City, for claimant.

HAIGHT, District Judge. The primary question in this matter, as I understand it, is whether claimant's stock in the Prudential Insurance Company, which was first pledged with the Fidelity Trust Company to secure the payment of a note or notes of the Blue Ridge Enamel Brick Company, and later with Milton E. Blanchard, to secure a note of the same company made to his order, was loaned by the claimant to her sons jointly—the bankrupt, Fred C. Blanchard, and William W. Blanchard—as it is contended on her behalf, or whether it was loaned to the Brick Company as the trustee contends. The referee has found in accordance with the claimant's contention. If his conclusion in that respect was correct, undoubtedly the allowance of the claim was proper. I have accordingly examined with care all of the evidence which was before the referee, and am forced to the conclusion that his finding was not justified from the evidence.

[1] In so deciding I have not been unmindful of the rule which prevails in this district, and elsewhere I think, that the court will not disturb the finding of fact of a referee, based upon conflicting evidence, involving questions of credibility, unless there is most cogent evidence of mistake and miscarriage of justice. In re Partridge Lumber Co., 215 Fed. 973, 976 (D. C. N. J.). But it is also a general rule that,

if the finding be a deduction from established facts or uncontradicted evidence, it will not carry any great weight, for the court, having the same facts, may as well draw inferences or deduce conclusions as the referee. In re New York & Philadelphia Package Co., 225 Fed. 219, 221 (D. C. N. J.). There was really no question before the referee which had to be solved from conflicting evidence, involving the credibility of witnesses, but rather the question was whether the evidence was sufficient to justify a finding that the stock was loaned directly to the sons of the claimant rather than to the Brick Company. A review of the evidence is necessary, I think, in order that the reasons upon which my conclusion is based may be understood.

[2] On August 1, 1904, the Brick Company borrowed $205,000 from the Fidelity Trust Company on its note, indorsed by the claimant and her three sons before named, and pledged as collateral security for its payment 1,176.46 shares of the capital stock of the Prudential Insurance Company, all or the greater part of which belonged to the claimant. Whether this was an original loan, or whether it was a consolidation of previous unpaid loans, the evidence does not positively disclose; but it would seem that it was the latter, supplemented possibly by an additional loan made on the day that the last-mentioned note was executed. On April 3, 1908, this note, as well as some others made by some of the claimant's sons individually (for the payment of which collateral belonging to the claimant had likewise been pledged), were called, and a demand made that they be paid on or before April 6th. In order to prevent a sale of the collateral, Milton E. Blanchard, another son of the claimant, who apparently was not interested in the Brick Company, took up the note held by the Fidelity, and on April 6th a new note for $216,411.67 (being the amount that he paid to the Fidelity), payable in one year from date, was made to his order by the Brick Company. It was indorsed by W. W. Blanchard, Fred C. Blanchard, and the bankrupt. There was pledged with it, as collateral, 1,225 shares of the capital stock of the Prudential Insurance Company belonging to the claimant, included in which, as far as I can ascertain from the evidence, were the 1,176.46 shares held by the Fidelity as collateral for the $205,000 note. This note was held by Milton E. Blanchard until March, 1914, a short time after the voluntary petition of the bankrupt in this case was filed, when the amount due thereon was paid by the claimant, in order to prevent the sale of the collateral which had been pledged for its payment, and the note was transferred to her. She is still the holder of it.

The disputed part of her claim is $271,155, which represents the amount due on the note, after giving credit for a dividend received from the Brick Company, which in the meanwhile had been adjudged a bankrupt. The claimant, as well as her three sons, were the only persons financially interested, at least to any extent, in the Brick Company. The bankrupt was the president, Fred C. Blanchard the treasurer, and William W. Blanchard the general manager. Its capital stock was originally $100,000, or $150,000, of which the claimant owned 100 shares, of the par value of $10,000. Afterwards she ac-

quired 300 shares of the par value of $30,000—possibly more—in liquidation of a debt due her for moneys which she had advanced from time to time to the company. The bankrupt apparently gave very little attention to the business of the Brick Company; William W. Blanchard having been in active charge of its affairs. There is no evidence that any new arrangement regarding the use of the claimant's stock as collateral was made when the note to Milton E. Blanchard was executed. Apparently the arrangement under which the stock was originally procured from the claimant to borrow money from the Fidelity was continued. The stock which was held by the Fidelity was simply turned over to Milton, and he assumed the position which the Fidelity had formerly occupied.

It is necessary, therefore, to ascertain what the evidence discloses as to the arrangements which were made when, and circumstances under which, the stock was originally acquired from the claimant. There was no written agreement, or any memorandum in writing, respecting any of the original transactions. The only competent evidence on this point, outside of a letter to the Fidelity signed by the claimant, was the unaided recollection of the claimant, and two of her sons and her daughter, as to what generally transpired when they asked her for stock for borrowing purposes, in which pursuit they seem to have been quite extensively engaged, both personally and on behalf of the Brick Company, for 10 years or more preceding the bankruptcy. The claimant, Mrs. Blanchard, a woman over 90 years of age, testified that she did not think that the stock was pledged for the Brick Company's debts, and did not know whether the sons specified the purpose for which they wanted it, although they may have done so. She had no clear recollection of the transactions, or anything about them. Her testimony may be well summarized in her own language, viz.:

"I loaned my stock to my boys. * * * Why, I loaned it to the boys whenever they wanted it; they knew they could have it when they needed it. * * * I trusted my boys and gave it to them; that is all I know about it."

Mrs. Walter, a daughter who lives with the claimant, and whose husband, in later years, has been attending to the claimant's business affairs, stated that she remembered that her brothers frequently met at their mother's home for luncheon, and on some occasions they requested loans of stock of the mother, that they might borrow on it; that she remembered, when improvements were needed at the plant of the Brick Company, the brothers would ask for a loan of the stock, so that they might borrow on it and make the necessary improvements; that her mother sometimes objected to having the stock go out of her hands, and would tell them "to be sure and return it to her as soon as they could"; that they would say that the stock would be perfectly safe with them, and that they hoped to return it soon.

Fred C. Blanchard testified that the brothers met at their mother's home very frequently for luncheon; that the brothers explained the condition of the Brick Company from time to time to their mother,

and that if they borrowed any stock it was for the purpose of getting money from the stock and placing it to the use of the company; that sometimes he procured the stock, and sometimes his brother did; and that—

"we always promised, at those times, to return the stock to her—just as soon as we possibly could * * * We [two brothers and himself] made an explanation of the need of the money and the condition of the company, and gave our promises to return the stock."

He admitted having testified, during an examination held in the general bankruptcy proceedings in this case under section 21a, regarding the manner in which the stock in question came into the possession of the Brick Company, as follows:

"As they needed money they borrowed the stock from my mother, and that was the only way."

The only explanation given by him of the apparent difference in his testimony was that by the use of the word "they" he referred to his two brothers and himself; that the "Brick Company was the three brothers."

W. W. Blanchard testified that, after he and his brothers had used up all of their stock, they felt compelled to go to their mother:

"We would say: 'Mother, it is absolutely necessary; we must have money, and can't you let us have say probably 10 or 20 shares of Prudential stock, and we will get the money on it.' * * * We always assured her we would hold ourselves responsible for the return of her stock. * * * My brother Theo would invariably say she need have no fear whatever; they (referring to the Fidelity Trust Company) wouldn't dare to sell her stock, and, if they did, we will see that it is made good, or she would get the equivalent back."

By "they" he stated that he referred to the Fidelity Trust Company, and by we "to Fred and myself." He further testified, when asked the direct question, that she had loaned the 1,225 shares to the three brothers. He admitted, however, that, when being examined in the general bankruptcy proceedings under section 21a, he had testified that the Blue Ridge Company had borrowed the stock in question from his mother. He attempted to explain the apparent conflict in his testimony by stating:

"I never differentiated between myself and my brothers, nor myself and the Blue Ridge Enamel Brick Company, until my attention had been called to the fact that I had stated that the Prudential stock had been loaned by my mother to the Blue Ridge Company. The importance of it was read to me, or rather the testimony was read to me, and I saw at a glance that I had said what was not the case. That stock was never loaned to the Brick Company, although in my testimony I said it was. I treated as one—we brothers—and never thought of differentiating between myself and my brothers. I did not realize the importance of it."

He then went on to reiterate that the stock was loaned to the sons, and was never loaned to the Blue Ridge. I cannot conceive that the testimony of Mr. John R. Hardin, who acted as an attorney for apparently all of the brothers, as well as the mother, at the time the Fidelity Trust Company note was taken over by Milton, and which was relied on very largely by the referee, was competent as establishing the conditions under which the stock was originally loaned,

or to whom it was loaned, because, as far as it appears, Mr. Hardin had no connection with those transactions, and the impression that he had—and he frankly stated that it was only an impression—that Mrs. Blanchard had loaned the stock to her boys, as distinguished from the Brick Company, was, for all it appears, based on what he had been told by others. It will be noted that all of the testimony recited above, which I have considered competent, was given by interested parties, and, as respects two of them, was quite different from that which they had given when the importance of establishing that the stock had been loaned to the sons, rather than to the Brick Company, was not apparent to them. All of the witnesses testified that the loans of stock by the mother covered a period of 10 years or more prior to 1908. None could testify when any particular loan was made, or how much stock was loaned at any one time. The witnesses were testifying in 1915. Moreover, it is entirely clear from this testimony that the claimant knew, at the time the stock was loaned, that it was to be used for the benefit of the Brick Company, in which she was interested as a stockholder, and apparently, at some of the times, as a creditor. Some of the testimony is more susceptible of the inference that the sons agreed to indemnify or hold her harmless against loss by reason of the delivery of the stock than that they were personally borrowing it. For instance, William testified:

"We always assured her that we would hold ourselves responsible for the return of the stock."

That clearly imports an indemnity agreement. If the stock was loaned to the sons, there was no need of an assurance to their mother that they would hold themselves responsible for the return of it. The bankrupt was not called as a witness, although he had testified in the main bankruptcy proceedings. It appears that on July 5, 1901, Mrs. Blanchard signed a letter, prepared by the president of the Fidelity Trust Company, authorizing the Brick Company "to borrow such sums of money and at such times as may be deemed by them necessary, for their use and benefit, and to pledge therefor certificates [naming them] of the capital stock of the Prudential Insurance Company of America, standing in my name on the books of the company." While, because of the claimant's age and the circumstances under which the letter was signed by her, I attach no great importance to it, the natural inference to be drawn from this letter is that the stock had been delivered to the Brick Company. Later on, when Milton took over the note, he wrote his mother a letter, stating the terms upon which he would hold certain of the pledged stock which he found necessary to be transferred to his own name, and therein referred to the stock as having been "pledged with your consent to secure the loan made by me to the Blue Ridge Enamel Brick Company."

In the dealings of the parties respecting the affairs of the Brick Company, there was apparently no distinction made between the claimant's three sons and the Brick Company itself. The mother was an indorser on the original note, and hence her liability thereon was fixed, irrespective of the stock furnished by her to be used as collateral. I can see no good reason, therefore, why the delivery of the

stock should have taken the form of a loan to the sons rather than to the company. The sons, in seeking to borrow the stock, were unquestionably acting, to the mother's knowledge, as agents for the company; the stock was to be, and actually was, used for the benefit of the latter, in which she was financially interested. The claim is presented by a very near relative of the bankrupt, and is sought to be proved by other relatives, whose interest in the establishment of the claim is apparent and substantial.

[3, 4] Under such circumstances, the evidence must be considered, as I fear the referee overlooked, in the light of two general rules, the latter of which cannot, I think, be too rigidly adhered to. The first of these rules is that, where an agent acts on behalf of a disclosed principal, his acts and contracts, within the scope of his authority, are, in the absence of an express agreement otherwise, the acts and contracts of the principal, and involve no personal liability on the part of the agent. Whitney v. Wyman, 101 U. S. 392, 396, 25 L. Ed. 1050; McCauley v. Ridgewood Trust Co., 81 N. J. Law, 86, 88, 79 Atl. 327; 2 C. J. 812, § 486, and cases there cited. And the presumption in such cases is that it was the intention to bind the principal only, which presumption can be overcome only by clear and explicit evidence of an intention to substitute his personal liability for that of the principal. Moline Malleable Iron Co. v. York Iron Co., 83 Fed. 66, 70, 27 C. C. A. 442 (C. C. A. 7th Cir.); Hall v. Lauderdale, 46 N. Y. 70, 74; 2 C. J. 813, § 487; Id. 923, § 661, and cases cited. The second rule above referred to is that claims of relatives of a bankrupt should be closely and carefully scrutinized, and not allowed, unless the evidence is clear and convincing. In re Domenig, 128 Fed. 146, 148 (D. C. E. D. Pa.); In re Grandy & Son, 17 Am. Bankr. Rep. 206, 214, 146 Fed. 318 (D. C. S. C.); In re Wooten, 118 Fed. 670, 671 (D. C. N. C.); Ohio Valley Bank Co. v. Mack, 163 Fed. 155, 89 C. C. A. 605, 24 L. R A. (N. S.) 184 (C. C. A. 6th Cir.); Baumhauer v. Austin, 186 Fed. 260, 108 C. C. A. 306 (C. C. A. 5th Cir.).

I am unable to conclude that the claimant's contention that the stock was loaned to the bankrupt and his two brothers personally, rather than as agents of the Brick Company, has been established as against other creditors by such clear, explicit, and convincing evidence as the before-mentioned rules require.

[5, 6] The next question is whether the fact that the claimant is now the holder of the note which was given by Milton to the Brick Company to take up the note originally held by the Fidelity, and that the bankrupt was an indorser thereon at the time she acquired it, entitles her to recover the full amount of the note from his estate; and, if not, what part thereof, if any, she may recover. This necessitates an ascertainment of the legal relationship which the pledging of the claimant's stock and the indorsing of the notes by the sons created as between the claimant and the sons. As the evidence fails to establish that the stock was loaned to the sons personally, there is presented a situation where it appears that stock belonging to the claimant was loaned by her, at the request of her sons, and used by them as representing the company, with her consent, for the express

purpose of enabling the Brick Company to borrow money on its note or notes; the latter being also indorsed by the sons for the same purpose. The stock was therefore surety for the payment of the note, for it is well settled that, when property is pledged by an owner to answer for the debt or default of another, it occupies the position of a surety. Brandt on Suretyship & Guaranty, vol. 1 (3d Ed.) § 43, and cases there cited; National Bank v. Silliman, 65 N. Y. 475, 478; Hanford v. Bockee, 20 N. J. Eq. 101, 105. The sons were likewise sureties for the payment of the note, and undoubtedly, as between themselves, their understanding (which parol evidence was admissible to show, Wilson v. Hendee, 74 N. J. Law, 640, 66 Atl. 413) was that they were to be cosureties. Thus it appears that the stock was pledged as security for the same debt as that for which the sons became surety, and at the same time. On this bare set of facts, were it not for the fact that the suretyship of the sons took the form of an indorsement of a promissory note, there would seem to be no question but that the claimant's stock and the sons were cosureties, and as such required to bear a proportionate share of the loss. Brandt on Suretyship & Guaranty, vol. 1, § 281, and cases there cited.

The trustee, however, invokes the rule laid down in a number of cases, and which I think may be considered as a general one, that an accommodation indorser of a note, except there be an agreement to the contrary, is not liable as a cosurety to a surety who signs a note as a maker (see cases cited in Brandt on Suretyship & Guaranty, vol. 1 [3d Ed.] § 286; 32 Cyc. 17, note 16), and contends that the claimant's stock occupied, in effect, the same position as if the claimant had signed the note as an accommodation maker. Hence it is argued on his behalf that, on familiar principles, the claimant cannot recover against the bankrupt. Even if it be assumed that the claimant's stock occupied the same legal position as if the claimant had signed the note as an accommodation maker, it seems to me that the trustee's contention is not sound, because it is entirely clear, in view of the circumstances under which, and the purpose for which the stock was procured and pledged, and the relationship of the parties toward the Brick Company, that the claimant and her sons never intended, as between themselves, that her stock should be liable for a greater proportion of the Brick Company notes than the sons should be liable for, which intention, for all present purposes, may be considered as a sufficient agreement between the sureties to satisfy the exception mentioned in the rule, and to overcome the presumption upon which the rule is based, that those who sign in different capacities are presumed not to be cosureties.

The claimant's contention that they were not cosureties is based on the proposition, set forth in her proof of claim and relied upon at the hearing and the argument, that the stock was not loaned to the company, but was loaned to the sons, and by them loaned to the company. Of course, if such were the fact it needs no argument to demonstrate that the stock, so far as the claimant is concerned, would not have occupied the position of a cosurety with the sons, for in that case the stock would have been pledged as the property of the sons, and not of the claimant. But, as it has been heretofore found, the

evidence does not establish that the stock was loaned to the sons. While there is some evidence from which it might be inferred that the sons had agreed to indemnify the claimant against loss (and if such had been the fact it would have, I think, rebutted the inference that the stock and the sons were cosureties), it would not be permissible, I think, to consider any such evidence in this matter, because it would be so utterly inconsistent and at variance with the theory on which the proof of claim is based, and the matter was tried, and the appeal argued. There could not exist at the same time an agreement to loan the stock to the sons personally and an agreement to loan the same stock to the company upon the sons' indemnity agreement.

The claimant having chosen to attempt to overcome the presumption of cosuretyship on the theory that the stock was loaned directly to the sons, and offered evidence to that effect, she is bound, on this appeal, at least, to stand or fall on the position which she has taken. I do not mean to be understood, by anything that I have just said, as intimating an opinion as to whether or not an indemnity agreement such as that above discussed would be within or without the statute of frauds. It follows, therefore, I think, that the only legitimate conclusion which can be reached is that the claimant's stock occupied the position of a cosurety with the sons for the payment of the note. Such being the relationship, it is entirely well established, as in reason it must be, that the mere fact that the claimant has paid and acquired the note in order to save her stock, does not entitle her to recover against one of her cosureties more than his proportionate share of the debt which she paid. Lidderdale v. Robinson, Fed. Cas. No. 8,337, 2 Brock. 159, affirmed 12 Wheat. 594, 6 L. Ed. 740; German, etc., Bank v. Fritz, 68 Wis. 390, 32 N. W. 123; Dillenbeck v. Dygert, 97 N. Y. 303, 49 Am. Rep. 525; McDaniel v. Lee, 37 Mo. 204; In re Carmichael, 96 Fed. 594 (D. C. N. D. Iowa); In re Bingham, 94 Fed. 796 (D. C. Vt.); 37 Cyc. 428; Brandt on Suretyship & Guaranty, vol. 1 (3d Ed.) § 341. As there is no evidence that the other sureties are insolvent, and no other equity to change the general rule appears, the claimant is only entitled to recover from the bankrupt's estate one-fourth of the amount which she paid to Milton E. Blanchard when she acquired the note. See 32 Cyc. 285, E, et seq., and cases cited.

My conclusion, therefore, is that, in so far as the order of the referee allowed her claim for any sum in excess of such one-fourth, it was erroneous, and should be reversed accordingly.