WALTER et al. v. ATHA. ATHA v. WALTER et al. In re BLANCHARD.

(Circuit Court of Appeals, Third Circuit. December 31, 1919.)

Nos. 2484, 2510.

1. BANKRUPTCY ⬤228—FINDINGS OF REFEREE ON UNCONTRADICTED EVIDENCE NOT ENTITLED TO WEIGHT GIVEN FINDINGS ON CONFLICTING EVIDENCE.

While a finding of fact by a referee on conflicting evidence will not be disturbed, unless there is cogent evidence of mistake, yet, if the referee's finding be a deduction from established facts or uncontradicted evidence, the judge is at liberty to draw his own inferences and deduce his own conclusions.

2. BANKRUPTCY ⬤467—FINDINGS OF TRIAL COURT ON UNCONTRADICTED EVIDENCE NOT CONCLUSIVE ON APPEAL.

Where the findings of fact of the bankruptcy court, which were in conflict with those of the referee, were based on deductions from uncontradicted evidence, the appellate court need not follow them, but may deduce its own conclusions, just as the trial court can disregard findings of referee.

3. BANKRUPTCY ⬤340—EVIDENCE HELD TO SHOW THAT CLAIMANT LENT STOCK TO HER SON, THE BANKRUPT, AND NOT TO A CORPORATION.

Evidence on behalf of claimant, the mother of a bankrupt, *held* to show that she lent stock to her son, the bankrupt, and not to a corporation in which he was interested and which pledged the same.

4. BANKRUPTCY ⬤340—CLAIMS BY RELATIVE CLOSELY SCRUTINIZED.

Claims of relatives of a bankrupt should be closely and carefully scrutinized, remembering, however, that the honest or dishonest character of such claim is not to be determined by mere relationship.

5. BANKRUPTCY ⬤314(1)—DUTY OF BANKRUPT TO REIMBURSE ONE LENDING HIM STOCK TO PLEDGE.

Where a mother lent her son corporate stock for the purpose of enabling the son to pledge the same and obtain funds for a corporation in which he was interested, the son was under an implied duty to reimburse his mother for expenses incurred in recovering the shares, because of his failure to return them, and such expenses may be proven as a claim on the son's bankruptcy.

⬤For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeal from the District Court of the United States for the District of New Jersey; Thomas G. Haight, Judge.

In the matter of Theodore C. E. Blanchard, bankrupt. From an order of the District Court (253 Fed. 758), allowing as reduced the claim of Emeline C. Blanchard, Effe B. Walter and another, as executors of the estate of claimant, since deceased, appeal, and Benjamin Atha, as trustee, cross-appeals. Reversed, with directions to the District Court to allow claim in full.

Vredenburgh, Wall & Carey, of Jersey City, N. J. (Albert C. Wall, of Jersey City, N. J., and William F. Allen, of New York City, of counsel), for Effe B. Walter and others.

Robert H. Southard, of New York City, for Benj. Atha, trustee, etc.

Before BUFFINGTON and WOOLLEY, Circuit Judges, and MORRIS, District Judge.

WOOLLEY, Circuit Judge. In the proof of claim and amended proof of claim filed by Emeline C. Blanchard in the bankrupt estate of her son, Theodore C. E. Blanchard, there is an item of $271,155. On petition by the Trustee for its rejection or reduction, the Referee allowed the item in full. On review, the District Court reduced it to one-fourth and later allowed it for one-half of its amount. From the order of the District Court, the claimant took this appeal, charging error to the court in not allowing the item in full. On cross-appeal, the Trustee assigns as error, first, the action of the court in not wholly expunging the item from the claim; and failing in this, second, its action in allowing the item for one-half of its amount instead of for one-fourth.

As the case is stated in the opinion of the trial judge, 253 Fed. 758, we shall do no more than give in outline the facts on which we think the case turns:

The transactions out of which this controversy arose extended over a period of twenty years or more. They began shortly after the death of the claimant's husband, who, having been one of the founders of The Prudential Insurance Company of America, left to his widow and several children a large number of shares of the highly valuable stock of that corporation. Three of his children, William W. Blanchard, Fred. C. Blanchard, and Theo. C. E. Blanchard, used their shares freely in borrowing money with which to embark upon various enterprises, which failed with singular regularity. The one with which we are here concerned was Blue Ridge Enameled Brick Company. As the financial needs of this and other projects exhausted their resources, the sons appealed to their mother from time to time and obtained her shares on which to raise the funds they required. These transactions, initially small in amount, were many in number. The first one bearing on this controversy involved $1176^{46}/_{100}$ shares, representing in the aggregate shares which the mother had at previous times and in smaller amounts turned over to her sons. These were pledged on a note of the Brick Company for $205,000, dated August 1, 1904, endorsed by the three sons and the mother, and negotiated with the

Fidelity Trust Company of Newark, N. J. In April, 1908, the Trust Company called this loan and also four loans of the three sons, amounting to $507,000, on which were pledged 2445⁹⁶/₁₀₀ shares of Prudential stock, variously owned.

Milton E. Blanchard, another son, took up the loan of the Brick Company and in return obtained from that Company a new note for $216,411.67, dated April 6, 1908, secured by the endorsement of the same three sons and by the pledge of 1225¹²/₁₀₀ shares of the mother's Prudential stock. The mother was not an endorser on this note.

Milton held the note until 1914, when all three sons who had engaged in the brick business, as well as the Brick Company itself, were in bankruptcy. In this state of affairs, Milton demanded payment and threatened to sell his mother's shares pledged with the note. Whereupon the mother bought the note from him, and on its endorsement to her, regained possession of her stock. The sum which she thus paid is the item in dispute in her claim against the bankrupt estate of Theo. C. E. Blanchard.

The mother's original proof of claim for this sum was based on her right of action as endorsee of the note against Theo. C. E. Blanchard, one of the endorsers. Her amended proof of claim was made on the ground that she had loaned her shares from time to time, in different amounts,—until they aggregated the number recovered from Milton—unto her three sons, William W., Fred. C., and Theo. C. E. Blanchard, for use by them personally in borrowing money for their various projects,—among them the Brick Company,—upon promises by them, jointly and severally made, to return the same; and that, upon the failure of Theo. C. E. and the others to keep their promises, she was compelled to lay out and expend the amount claimed in order to recover her shares.

The argument on the law of this case has taken a wide range, involving questions of ·rights and liabilities of endorsers, co-sureties, and contribution, arising out of the finding of the learned trial judge that the mother's loans of her shares were to the Brick Company and not to her sons personally. Before we are called upon to consider these questions of law, we must first ascertain the precise character of the transactions between the mother and her sons, and determine, as a matter of fact, whether she loaned her shares to her sons to enable them to finance the Brick Company, or whether she loaned her shares to the Brick Company, and thereby financed it herself.

[1, 2] The testimony on which this case was submitted first to the Referee, then to the District Court, and now to this court, to determine, as a fact, the character of the transactions between mother and sons is unusual in that it was nowhere in conflict and the credibility of no witness was at any time attacked. The learned trial judge was mindful of the rule prevailing in this circuit against disturbing a finding of fact by a Referee, based on conflicting evidence and involving questions of credibility, unless there is cogent evidence of mistake; In re Partridge Lumber Co. (D. C.) 215 Fed. 973, 976; but proceeded to a finding opposite to that of the Referee under the rule, that if the Referee's finding be a deduction from established facts or uncontra-

dicted evidence, the judge, reviewing the Referee and having before him the same facts, is at liberty to draw his own inferences and deduce his own conclusions. In re New York & Philadelphia Package Co. (D. C.) 225 Fed. 219, 221; Baumhauer v. Austin, 186 Fed. 260, 108 C. C. A. 306; Ohio Valley Bank Co. v. Mack, 163 Fed. 155, 158, 89 C. C. A. 605, 24 L. R. A. (N. S.) 184. We do not believe we are expanding the latter rule beyond its proper limits by extending it to ourselves on this appeal.

[3] In proof of her claim, the mother showed that her three sons lunched with her and her daughter weekly, and at these luncheons the sons would represent to her their need for money to carry on their business and would ask her to loan them her Prudential shares. The mother was far advanced in years and timid. To these requests she would usually demur; though later she would uniformly yield. In representing their needs, the sons frankly told the mother the uses for which they wanted her stock, among which was the raising of money for the Brick Company, assuring her that the loans to them would be perfectly safe and promising always to return them as soon as possible. The shares when taken were pledged by the sons with the Trust Company on their own notes and on notes of their business enterprises, among them the Brick Company.

These transactions began when the mother's inheritance of 2000 shares of Prudential stock was intact, and after the sons' inheritances had been exhausted in their various undertakings. They continued until the most of the mother's inheritance had been transferred from her possession to pledges on the notes of the Brick Company and of her sons, and until their bankruptcy ensued.

The advanced age of the mother must, of course, be considered in appraising her testimony, yet the very simplicity with which it was given lends force to it. Her testimony tended to prove that while she knew of the Brick Company as one of her sons' enterprises, she was not conscious of having loaned her shares to it. The following excerpt from her testimony shows its character:

"Q. Do you know about this company borrowing any money?
"A. No, I do not, not specially. I loaned my stock to my boys. * * *
"Q. Can you remember whether there was a written agreement with your son Theodore as to what he should do with this stock of yours?
"A. Why, I loaned it to the boys whenever they wanted it. They knew they could have it when they needed it."

A daughter, always present at the luncheons, testified to the conversations between the mother and her sons, to their requests for the loan of her Prudential shares, and to the delivery by the mother of her certificates to her sons.

The testimony of Fred. C. and William W. Blanchard went directly to the point that the loans were personal to the three sons. True, the testimony of the daughter was that of a witness interested in the outcome of the controversy; but it is doubtful that the testimony of these two sons was affected by any financial interest. Added to this testimony was that of John R. Hardin, Esq., who, by reason of his relation to the Blanchard family as counsel for many years, was intimate-

ly acquainted with their business affairs. He had, however, no knowledge of this transaction at its inception, and, therefore, could not testify that the transfer of shares by the mother to the sons was personal to them. He testified, however, on his knowledge of the conduct of the family business, that he believed the shares were loaned by the mother to the sons. If his testimony was admissible, it would be conclusive of the issue. But the learned trial judge considered it incompetent, and therefore rejected it. Even with Mr. Hardin's testimony out of the case, we are satisfied that the claimant has, on other testimony, established, prima facie, a right to the allowance of the item in dispute.

In opposition to its allowance, the Trustee produced no evidence that Mrs. Blanchard ever had transactions of any kind with the Brick Company beyond the fact that she was at one time the holder of 100 of its 6000 shares of capital stock and at another time the holder of 300 shares. He offered no testimony in contradiction of the testimony for the claimant that the loans of the mother's shares were to her sons personally, except a paper, dated July 5, 1901, when the sons began to borrow and use the mother's shares in raising money for the Brick Company. This paper bears the signature of Emeline C. Blanchard, and is addressed to the Fidelity Trust Company, and purports to be a continuing authority given the Brick Company to pledge her shares of stock with the Trust Company in borrowing money. This paper was signed more than three years before the date of the first Brick Company note, and it was given by Mrs. Blanchard on the demand of the Trust Company, as stated by its President, in order that it might have recourse without question to her stock pledged as collateral, in the event of default on the note by the maker.

We do not regard this transaction as inconsistent with the claimant's proofs that her loans were made to her sons personally. Some of the loans made to her sons were admittedly made for use by them in raising money for the Brick Company. They could not get money from the Trust Company for the Brick Company on her shares unless her shares were put in a position that the Trust Company could have recourse to them in the event of the Brick Company's default. The Trust Company's demand upon Mrs. Blanchard for written authority to pledge the shares was one that is quite customary in banking circles when a bank is loaning money to a person offering as collateral the securities of another; and compliance with such a demand is quite customarily made by the owner of securities so loaning them. From this paper, made under the circumstances testified to, we cannot draw the inference that Mrs. Blanchard loaned her shares to the Brick Company. The paper evidences nothing but her purpose to place her shares in position to enable her sons to realize on them.

In our examination of the record, we find that no witness testified that Mrs. Blanchard loaned her shares to the Brick Company. Oppositely, several witnesses testified affirmatively and positively that she loaned her shares to her sons. While the force of the testimony of some of these witnesses is modified by varying degrees of interest, we cannot, in the absence of their impeachment, reject it. Unless we

wholly disregard their testimony, the claimant must prevail, for opposed to their testimony the Trustee produced nothing. Aside from the direct testimony of witnesses that the mother loaned her shares to her sons, the natural and probable inferences, lawfully to be drawn from the transactions, as evidenced by the acts and conduct of the participants throughout a long period of time, are, that she loaned her shares to her sons, not as agents of the Brick Company as a disclosed principal (Whitney v. Wyman, 101 U. S. 392, 396, 25 L. Ed. 1050), but to them personally for their use in raising money for the Brick Company and their other undertakings.

[4] In reaching this conclusion, we have endeavored carefully to keep in mind the rule that a claim of a relative of a bankrupt should be closely scrutinized; remembering, however, that the honest or dishonest character of such a claim is not to be determined by mere relationship. Davis v. Schwartz, 155 U. S. 631, 638, 15 Sup. Ct. 237, 39 L. Ed. 829; Estes v. Gunter, 122 U. S. 450, 456, 7 Sup. Ct. 1275, 30 L. Ed. 1228; Ohio Valley Bank Co. v. Mack, 163 Fed. 155, 156, 89 C. C. A. 605, 24 L. R. A. (N. S.) 184; Baumhauer v. Austin, 186 Fed. 260, 265, 108 C. C. A. 306.

[5] On this finding of fact, the claimant's right (or that of her personal representatives) to the full allowance of the disputed item in her claim is established certainly under one of several familiar principles of law, namely, on her son's implied contract to reimburse her for expenditures she was required to make in recovering her shares because of his failure to keep his promise to return them.

We direct that the District Court modify its order by allowing in full the item of the claim in dispute, and that the costs of this case, both in the District Court and in this court, be paid by the Trustee out of the estate of the bankrupt as a cost of administration.