### In re McCLELLAND.

(District Court, S. D. California, S. D. December, 1920.)

1. Bankruptcy ⟷342½—Conclusions of referee not binding on court, where evidence is not conflicting.

In bankruptcy proceedings, where there is no conflict in the evidence on objections to a claim, and the conclusions of the referee are based entirely upon inferences drawn from the evidence, or want of evidence, such conclusions are not binding upon the court; the court being as able as the referee to indulge in inferences from the testimony.

2. Bankruptcy ⟷314(1)—Relative creditor may file claim and participate in dividends.

A relative of a bankrupt has a perfect right to loan the bankrupt money, and, having done so, may file a claim in the bankrupt's estate and participate in the dividends properly allowed.

3. Bankruptcy ⟷340—Claim by relative carefully scrutinized.

A claim by a relative of the bankrupt for money loaned bankrupt will be carefully scrutinized.

4. Bankruptcy ⟷340—Claim for money lent bankrupt by sister allowed.

On objections to claim for money lent bankrupt by his sister, where there is no evidence directly or even inferentially contradicting the sis-

ter's sworn statements as to the money lent the bankrupt, and there is nothing in her evidence rendering it inherently improbable or absolutely incredible, the claim should be allowed.

In Bankruptcy. In the matter of George B. McClelland, bankrupt. On trustee's and creditors' objections to the allowance of claim of Margaret Warren for $1,620. Order of referee, disallowing the portion of the claim not conceded, reversed, and claim allowed.

The opinion of Force, referee, disallowing the portion of claim not conceded, is as follows:

On the hearing, the objecting creditors and the trustee, on the one hand, withdrew the objections to the item of $35 and conceded that the amount was advanced as set forth in the claim. On the other hand, the attorney for the claimant, with the permission of the referee, withdrew the item for $325, and the same is to be deemed expunged from the files and records of the case. This leaves a balance of the claim for consideration amounting to $1,260, which is made up of the four loans alleged either on the face of the claim or in the testimony to be made as follows:

| | |
|---|---|
| June 15, 1914 | $500.00 in cash. |
| August 2, 1914 | 350.00 in cash. |
| January 16, 1915 | 210.00 in cash. |
| April 6, 1915 | 200.00 in cash. |
| Total | $1,260.00. |

On the hearing the position taken by the trustee and the objecting creditors was that it was not only improbable that the loans had been made, but that it was absolutely incredible; that the claim was not sustained by sufficient proof offered or introduced on the part of the claimant, and that the evidence, viewed from the standpoint of ordinary human experience, would not justify a belief or sustain a finding to the effect that the money had been loaned.

These purported loans constituted what is sometimes called in the bankruptcy court a family affair, the claimant being a sister of the bankrupt. Testimony shows that she is of about the age of 55 years, and that the bankrupt is —— years of age. There is testimony to the effect that during their lives it has been their custom to lend money, the one to the other, although the amounts and the times of such loans are left very indefinite and vague. If the referee is to allow the claim, he must do so largely, if not entirely, upon the mere weight of the oath of the claimant and of the bankrupt that the amounts named were loaned at the dates specified. There is scarcely, if any, evidence, and no very satisfactory evidence, where claimant obtained the money which she loaned to her brother, for what purposes the bankrupt obtained the same, what he did with it, or the circumstances surrounding the passing of the money from the hands of the sister to the brother. The claimant does not seem to have presented her claim with detail which is naturally to be expected in such a case. The referee feels that it is the duty of the bankruptcy court to scrutinize with extreme care such claims, and to examine the details at length before allowing them. The referee feels that there is an additional responsibility upon him in deciding these cases, because every cent that is left in the family is taken away from the outside creditors.

In these family cases, it is the custom of the referee to divide the examination, so far as he is concerned, into three or four portions or topics: First, he investigates at length the sources from which the claimant may have obtained the money loaned or advanced; secondly, the purposes for which the money was to be used; thirdly, in great detail the circumstances leading up to, surrounding and following the passing of the money; and, lastly, the manner in which the money was used. In all these respects, the evidence in this case is extremely meager. There is no evidence definitely showing the source from which the claimant obtained the moneys loaned. It appears that she is a housewife, married to a carpenter, who has been accustomed to earn about $100 a month. It does not appear what the expenses of the claimant's house-

hold were, although the referee endeavored to obtain information on that point. It seems that the claimant and her husband live in a rented house, but there is no testimony showing the amount of the rental. There is also testimony brought out by the referee that the claimant rented one or two rooms, but did not take boarders. The referee was unable to learn the amount of the room rentals, or the number of roomers, either as an average or otherwise. There is testimony to the effect that the claimant received some property from her mother, either at the time of her mother's death or immediately prior thereto. The referee was unable to learn the amount of this property or its nature, or what the claimant had done with the property so received, or whether she had invested it in any manner. So far as the referee could learn, the claimant kept no bank account, but had been accustomed to keep the money which she loaned to the bankrupt in her house. It does not appear where in the house she kept it, or in what amounts, or how much she had on hand over and above the amount of the loans which she made to the bankrupt. It does not appear whether or not the claimant's husband was accustomed to give her money which she was in the habit of saving. In short, the referee was not able to determine the source from which the claimant obtained the amount of these loans, with any satisfaction to the mind of the referee; and the referee feels that it is the duty of claimants in such cases to render the referee greater assistance in making such determinations.

Further, the testimony of the circumstances surrounding the passing of the money is of the most general and vague character. There are no details which are reasonably to be expected in such cases. The claimant simply produced the money in gold and bills, at no certain or specified time, and with little or no inquiry as to the amount required or the purposes for which it was to be used, counted the money into the hands of the bankrupt. In the first instance, $500 on June 15, 1914, and $350 additional on August 2, 1914—$850 in less than six weeks; the money coming from an unknown source and going to an ambiguous and uncertain destination. The referee does not know why the loan of June 14, 1914, was $500 instead of more or less, nor why the loan of August 2, 1914, was $350, instead of more or less. Mr. McClelland testified that he needed the money in connection with a certain patent which had been applied for, and in which he was interested. The claimant testified that she understood that the money was to be used in connection with certain real estate deals or speculations, but it seems that nothing definite was discussed at the time of the loan. The referee feels that in transactions involving such amounts of money there would be some discussion between the parties in respect to the need or use of the money, and that such discussion would leave a more distinct impression upon the memory than seems to have been left upon the memory of the claimant and the bankrupt in this case. Not only are the purposes for which the money was to be used vague and uncertain, but the uses to which the money was actually put. There is no satisfactory testimony as to where it came from or where it went to.

The referee regards this as a case of considerable importance, for it involves questions which are repeatedly arising in the administration of bankrupt estates by the referee. The question which the referee presents to himself is this: Is he now and in the future to allow claims of this kind, supported simply by the statement and oath of the parties immediately concerned, both of whom belong to the same immediate family? If the referee is to allow such claims, supported by such testimony, it will be extremely easy for claimants to present such claims, and for the referee to approve and allow them. The referee is of the opinion that one of the most dangerous kinds of evidence that is presented to courts or to judicial officers is evidence that is based upon the mere weight of an oath, upon the mere assertion of the witness testifying without anything of a tangible, palpable nature accompanying the assertion; evidence unsupported by any vestige or trace in the form of a writing or some similar, substantial, material record of the transaction which came into existence at the same time with, and was in some way connected with, the transaction to which the testimony relates. Stephen, in his History of the Criminal Law of England, writes with great force of the danger of such testimony, as follows:

" \* \* \* The juries seem to have thought (as they very often still think) that *a direct unqualified oath* by an eye- or ear-witness has, so to speak, a *mechanical* value, and must be believed unless it is distinctly contradicted. \* \* \*

"The most remarkable illustrations of these remarks is to be found in the trial of the five Jesuits. Fenwick objected that the evidence against him was entirely composed of accounts of the contents of letters not produced. 'All the evidence that is given comes but to this: There is but saying and swearing. I defy them to give one probable reason to satisfy any reasonable man's judgment how this can be.' Upon this Scroggs observed: 'Mr. Fenwick says to all this, Here is nothing against us but talking and swearing; but for that he hath been told (if it were possible for him to learn) that all testimony is but talking and swearing, for all things, all men's lives and fortunes, are determined by an oath, and an oath is by talking, by kissing the book, and calling God to witness to the truth of what is said.'

"I think that Fenwick was right as to what the law, or rather the practice of juries, ought to be, and that Scroggs was right as to what it actually was and, to a certain extent, still is. It is true that juries do attach extraordinary importance to the *dead weight* of an oath. It is also true, so circumstances corroborate each other, and of the intrinsic probability of the matter sworn to, is a far better test of truth than any oath can possibly be, and I should always feel great reluctance to convict a prisoner on the uncorroborated testimony of a single witness to words spoken, *or to any other isolated fact which, having occurred, leaves behind it no definite trace of its occurrence.*" The italics are the referee's.

The referee is aware that Mr. Stephen is speaking of criminal trials and criminal evidence; nevertheless, his reasoning applies with great force to the danger of finally accepting as conclusive, even in civil cases, the "dead weight of an oath" as to "any isolated fact which, having occurred, leaves behind it no definite trace of its occurrence."

To prove the making of the loan by Mrs. Warren, there is left behind no writing or corroborating circumstance—"*no definite trace of its occurrence.*"

The referee has been extremely concerned over the presentation of this claim; for he realizes that it is possible that the money may have been loaned and advanced in the open and careless way which the testimony indicates. Even if it has been so loaned, it is certainly to be desired in all justice that it should be returned, or at least that the claim should be allowed. But it seems to the referee that the claimant could have, and should have done much more toward assisting him in his determination with evidence which would support such an allowance.

To allow a claim in bankruptcy upon such evidence would constitute a dangerous precedent, and would open the door to conspiracy and fraud and enable dishonest people to rest their claims simply upon their own bare assertions and statements under oath.

The referee is of the opinion that the claimant has not sustained her position by evidence sufficient to justify a finding in her favor. It is to be remarked that the claimant did not appear in person upon the hearing so that the referee might interrogate her, but allowed her testimony to be presented in the form of a deposition, which the referee feels is a most unsatisfactory method of asserting one's rights in a court of justice.

The claim is therefore disallowed except for the sum of $35, which is conceded by the trustee.

Findings, conclusions, and order will be entered accordingly.

C. E. McDowell, of Los Angeles, Cal., for trustee.
Wm. Northrup, of Alhambra, Cal., for objecting creditors.
E. B. Coil, of Los Angeles, Cal., for claimant.

BLEDSOE, District Judge. This is a review of the action of the referee in bankruptcy in disallowing a claim to the extent of $1,260

duly and regularly made and filed in the above proceedings by Mrs. J. P. Warren, a sister of the bankrupt.

[1] The court has gone over very carefully the report of the referee containing his reasons for the disallowance of the claim, together with the claim itself and all the evidence in the case relevant thereto. It seems to be the law that, there being no conflict at all in the evidence, and the conclusions of the referee being based entirely upon inferences, drawn from the evidence, or want of evidence at hand, the conclusions of the referee are in no sense binding upon the court. The court is just as able to indulge in inferences from the testimony adduced as is the referee. It is not a case where there is a conflict in the evidence and the referee is in a more advantageous position, presumably, because of the inspection of the witnesses, etc., to arrive at a conclusion respecting the verities of the transaction. In re Swift (D. C.) 118 Fed. 349; In re People's Department Store (D. C., N. Y.) 20 Am. Bankr. Rep. 244, 159 Fed. 286.

In my judgment, the case here may well be ruled by Baumhauer v. Austin (C. C. A., 5th Cir.) 26 Am. Bankr. Rep. 385, 186 Fed. 260, 108 C. C. A. 306, wherein the action of the referee and of the District Court, in a transaction, not dissimilar to the one at bar, was set aside by the Circuit Court of Appeals of Fifth Circuit and the claim allowed.

[2, 3] It is fundamental, of course, that a relative of a bankrupt has a perfect right to loan the bankrupt money, and, having done so, he has a perfect right, the same as any other person, to file a claim in the bankrupt's estate and participate in the dividends properly allowed, etc. Davis v. Schwartz, 155 U. S. 631, 638, 15 Sup. Ct. 237, 39 L. Ed. 289. The fact that the transaction is between relatives would, of course, very naturally justify unusual care and scrutiny in examination as to its genuineness, but would in no wise debar the claimant from obtaining all rights properly belonging to him and properly supported by legal and adequate proofs.

In this case the sister lived at Santa Barbara with her husband, who was a contractor and carpenter and making about $100 per month, and who turned over to her each month about that sum for the care of the house, etc. After paying the running expenses, with commendable frugality, she would save the balance. She also let out two of her rooms to roomers, and retained for herself all of this money. She never deposited her savings in the bank, but kept them as they grew, with her in her home, a highly undesirable, but at the same time a not infrequent, mode of procedure, as common experience will testify. In addition to that, her mother left her some money before her death, which she also kept in her home as a part of her savings. She and her brother, the bankrupt herein, a sort of irresponsible individual, were upon the best of terms, and in times gone by, when he apparently was in better luck, he had loaned her money; and now that she possessed some savings and he had need of money in furtherance of the manufacture and sale of an automobile invention, in which he was interested, it was in no wise unnatural or peculiar, much less incredible,

that he should apply to her for financial assistance. It also is in the record that he had trouble in his family, the exact nature or the consequence thereof not being developed.

On the whole case, however, there is nothing at all of a nature sufficient to induce the belief, which the referee apparently entertained, that this entire claim was fraudulent. The proven conduct of the parties was not unnatural or improbable. The money seemingly was advanced from time to time on at least five different occasions by the sister to the bankrupt for use in his business, or to tide him over, or help him along, and while his evidence, due to his obvious physical debilitation, was not as enlightening as it might have been, the sister's rights are in no wise to be prejudiced because of his inability to remember precisely what he had done with her money. The question in the case is: Did the sister loan him the money as asserted, and, if so, has it been paid back? There is no claim made that the money was ever paid back, and I can see no rational ground for indulging in the conclusion that the loan was never made, and that the whole thing is a "frame-up," to use a colloquial but forceful expression.

Some complaint seems to have been made by the referee that no indicia of indebtedness were given from time to time as the loans were made; but this is not exactly in accordance with the facts, as there seems to be no doubt from the evidence but that a memorandum of the transaction was made each time; and, if the parties had really intended to perpetrate a fraudulent scheme, they would, of course, have sought to perfect it by sedulously preparing and providing full written evidence of the things alleged to exist, but which were to exist only in the imagination and pursuant to the preconcerted plan. The fact that after four of the loans had been made, the sister complained to the brother about the amount that had been loaned and the fact that she then had no security, and that he, then and there, seemingly long before any question of his probable bankruptcy had arisen, gave her a deed to the only real property that he possessed as security for the loans, seems to me to bear out the truth of the assertions of the claimant with respect to the making of the loans. There is no doubt but that this deed was given, and it is a fact that would seem to provide a very satisfactory sort of corroboration with respect to the making of loans originally. It was a natural and probable thing to occur and to be done.

The language of the Circuit Court of Appeals in the Baumhauer Case, to the effect that the referee "failed to allow adequate probative force to the claimant's proof of claim," citing Whitney v. Dresser, 200 U. S. 532, 26 Sup. Ct. 316, 50 L. Ed. 584, seems peculiarly apposite herein. Our own Circuit Court of Appeals in Moore v. Crandall (C. C. A. 9th Cir.) 30 Am. Bankr. Rep. 517, 205 Fed. 689, 691, 124 C. C. A. 11, used practically the same language.

I commend, of course, the referee's zeal to protect bankrupt estates against imposition through the filing of fraudulent claims, but it seems to me that, the prima facie proof being made, there should be more evidence that perjury or attempted fraud is being or is about to be practiced in the premises. The claimant, on her examination, orally

on deposition, in no wise declined to answer any questions asked her, and if the referee was desirous of securing further evidence, or evidence upon points not covered in the deposition originally, it was his function to suggest a further examination. There was no evidence at all adduced by the objectors, tending to show that the loans had not, or could not, have been made.

[4] I repeat again, the question is not what her brother did with the money, or her brother's good faith in the premises, although the latter does not seem, in my judgment, in any wise challenged; but the question is: Did she loan the money, and has it been repaid to her? And, there being no evidence directly or even inferentially contradicting her sworn statements, is there anything in her evidence that suffices to render it inherently improbable or "absolutely incredible?" I cannot find anything of that sort, and am of the belief that the referee erred in his conclusions to that end.

The order of the referee is reversed, and he is directed to allow the claim for the sum of $1,260, heretofore disallowed by him.